**GELDERMANN, INC.,**
**Plaintiff–Appellee,**

**and**

**Board of Trade of the City of Chicago,**
**Intervening–Appellee,**

**v.**

**COMMODITY FUTURES TRADING COMMISSION,**
**Defendant–Appellant.**

No. 87–1312.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1987.
Decided Dec. 22, 1987.

Mary C. Albert, C.F.T.C., Washington, D.C., for defendant-appellant.

Donald P. Colleton, Ruberry Phares Abramson & Fox, Scott E. Early, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, CUMMINGS and POSNER, Circuit Judges.

CUMMINGS, Circuit Judge.

The question presented by this appeal is whether the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 1 *et seq.*, dictates that the Commodity Futures Trading Commission ("CFTC" or "Commission") promulgate rules requiring commodity exchange members to submit to customer-initiated arbitration, and, if so, whether such a requirement violates Article III of the United States Constitution or the Seventh Amendment. We hold that Congress, through the CEA, intended to require mandatory submission to customer-initiated arbitration and that this requirement does

not violate Article III or implicate the Seventh Amendment.

### I. *Commodity Exchange Act Requires Arbitration of Claims of Customer Seeking That Remedy.*

■ Although this case arises in its current form between Geldermann, Inc. ("Geldermann"), a commodity brokerage firm, and the CFTC, it is the latest action in the ongoing dispute between the Chicago Board of Trade ("CBOT") and the CFTC regarding the mandatory submission of CBOT members to customer-initiated arbitration proceedings.[1] In fact, the CBOT raised precisely the same issue before this Court in *Board of Trade of the City of Chicago v. Commodity Futures Trading Commission*, 704 F.2d 929 (7th Cir.1983) (hereinafter *"CBOT v. CFTC"*). At that time, however, we determined that the issue was not yet ripe for adjudication and declined to reach the constitutionality of either Section 5a(11) of the CEA or CFTC Rule 7.201, *id.* at 932–935, both of which the CFTC interprets as mandating arbitration on customer demand. In dictum, this Court went on to say:

> the Board need not flout the rule in order to challenge its validity. A member or employee ordered by the Board or the Commission to arbitrate under Rule 7.201 could simply bring a suit to enjoin arbitration or to enjoin enforcement of an arbitration award against him on the ground that the Commission's rule requiring arbitration is invalid.

*Id.* at 933; this text was repeated in the footnote to CBOT Regulation 620.01(B), *infra* at 314. Geldermann is a CBOT member seeking to enjoin arbitration of claims filed against it by its former customer, FSI Futures, Inc. ("FSI"). Geldermann's complaint now requires us to consider the constitutionality of the Act, the CFTC Rule and the CBOT Regulation which mandate arbitration.

The CEA broadly prohibits fraudulent and manipulative conduct in connection with commodity futures transactions. In 1974, Congress "overhaul[ed] 'the Act in order to institute a more comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3250, 92 L.Ed.2d 675 (1986) (quoting H.R. Rep. No. 93–975, 93rd Cong., 2d Sess. at 1 (1974)). To implement this new structure, Congress created the CFTC as an independent agency vested with sweeping authority to adopt any rules that in its judgment are necessary to effectuate the purposes of the Act. 7 U.S.C. § 12a(5) (1974). See generally *Schor*, 106 S.Ct. at 3250; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 365–366, 102 S.Ct. 1825, 1832–1833, 72 L.Ed.2d 182 (1982).

As part of the 1974 amendments to the Act, Congress passed Section 5a(11) which required a contract market such as the CBOT[2] to:

> Provide a fair and equitable procedure through arbitration or otherwise for the settlement of customers' claims and grievances against any member or employee thereof: *Provided,* that (i) the use of such procedure by a customer shall be voluntary and (ii) the procedure shall not be applicable to any claim in excess of $15,000, (iii) the procedure shall not result in any compulsory payment except as agreed upon between the parties, and (iv) the term "customer" as used in this paragraph shall not include a futures commission merchant or floor broker....

7 U.S.C. § 7a(11) (1974).

To effectuate the provisions of Section 5a(11), in 1976 the Commission adopted regulations governing the administration of contract markets' customer grievances. The regulations required every contract market to "adopt rules which provide for a

---

1. The defendants below were the CBOT, the CFTC and FSI Futures, Inc. The CBOT continues its dispute with the CFTC over this regulation by joining on appeal as the intervening-appellee, filing its own brief and participating with Geldermann on oral argument.

2. Pursuant to Section 5 of the Act, 7 U.S.C. § 7, the CBOT was designated by the Commission as a contract market.

fair and equitable procedure through arbitration or otherwise for the settlement of customer's claims and grievances against any member" and set forth minimum requirements to be followed by a contract market when adopting such a procedure. 17 C.F.R. § 180.2 (1976). The Commission believed, as it still does, that its regulations require a contract market "to provide a procedure where the member must arbitrate when called upon to do so." 46 Fed. Reg. 57457, 57461 (Nov. 24, 1981). Further, it believed that Congress intended to compel arbitration upon customer request when it enacted Section 5a(11), 46 Fed.Reg. at 57458, and that a mandatory customer-initiated arbitration rule was necessary to effectuate the purposes underlying Section 5a(11). 46 Fed.Reg. 3027, 3028 (Jan. 13, 1981); accord *CBOT v. CFTC*, 704 F.2d at 934. As the Commission later stated when its interpretation was challenged by the CBOT, "[t]hese requirements would be meaningless and of no effect if exchanges did not require contract market members to participate in arbitration proceedings initiated by customers." 46 Fed.Reg. at 3028.

In accordance with the Commission's interpretation of Section 5a(11), ten of the eleven contract markets submitted arbitration rules which required their members to participate in arbitration proceedings initiated by customers; the Commission approved all of these rules. 46 Fed.Reg. at 3028 n. 5. The one exception was the CBOT. The CBOT took the position that Section 5a(11), as implemented under 17 C.F.R. Part 180,[3] did not require members of the exchange to submit to the arbitration of claims when a customer initiates such a proceeding. *Id.* In direct opposition to the Commission, the CBOT proposed regulations that permitted members of that exchange or its employees to refuse to participate in arbitration proceedings initiated by customers. 46 Fed.Reg. at 3028.

The Commission advised the CBOT that Congress did not intend to allow members the option of refusing to participate in exchange arbitration proceedings and requested that the CBOT amend its rules accordingly. *Id.* When the CBOT refused, the Commission, acting pursuant to its authority under Section 8a(7) of the Act, altered proposed CBOT Regulation 620.01(B) to conform to the Commission's interpretation of Section 5a(11) and adopted Rule 7.201 to reflect the alteration. 46 Fed.Reg. at 57463–57464.[4]

One month later, on December 24, 1981, the CBOT filed suit in the United States District Court for the Northern District of Illinois seeking both a permanent injunction to restrain the CFTC from enforcing Rule 7.201 and a declaratory judgment that the Rule, due to its preclusion of the right to a jury trial, violated the Seventh Amendment. *Board of Trade of the City of Chicago v. Commodity Futures Trading Commission*, No. 81 C 7175, slip op. (N.D. Ill. April 23, 1982). The district court found that, contrary to the Commission's interpretation, Section 5a(11) did not require the CFTC to adopt rules mandating participation by contract market members in customer-initiated arbitration proceedings. *Id.* at 7. Because the district court determined that the challenged arbitration requirement was imposed by the CFTC without direction by Congress to do so, it considered the constitutionality of CFTC Rule 7.201, but not of CEA Section 5a(11). The court held that Rule 7.201 violated the Seventh Amendment and permanently enjoined the CFTC from enforcing Rule 7.201 against the CBOT, its members and their employees. *Id.* The Commission appealed that decision to this Court, but before we

---

3. Part 180 of the CFTC's regulations covers arbitration or other dispute settlement procedures.

4. Rule 7.201 stated in relevant part:
 *Customers' Claims and Grievances.* The Arbitration Committee and Mixed Panels constituted pursuant to Regulation 620.02 have jurisdiction to arbitrate all customers' claims and grievances not in excess of $15,000 against any member or employee thereof which have

arisen prior to the date the customer's claim is asserted. If the customer elects to initiate an arbitration proceeding of any customer claim or grievance, *the member shall submit to arbitration* in accordance with these Arbitration Rules and Regulations.
 17 C.F.R. § 7.201, Regulation 620.02(B) (1981) (emphasis added).

decided the appeal, Congress amended Section 5a(11). See 704 F.2d at 934–935.

Congress' amendment repealed the language relating to compulsory payments, eliminated the $15,000 ceiling on claims subject to arbitration, and broadened the definition of customer.[5] Neither the effect of nor the intent behind these amendments was to reject the CFTC's interpretation of the Section. During the 1982 re-authorization process, Philip Johnson, the Chairman of the CFTC, expressly informed Congress of both the Commission's interpretation of Section 5a(11) and the 1982 conflicting opinion of the district court in *CBOT v. CFTC*. *Commodity Futures Trading Commission Reauthorization: Hearings before the Subcomm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture, Nutrition, and Forestry*, 97th Cong., 2d Sess. 67 (1982) ("1982 Senate Hearings").[6] Thus aware of the conflicting interpretations of the Commission and the district court, Congress expressly stated that the 1982 amendments "[do] not affect the existing requirement that the use of arbitration by the customer is voluntary or the *Commission's understanding that exchange members must participate in arbitration proceedings which the customer has elected to pursue*." H.R.Rep. No. 565, 97th Cong., 2d Sess. 56 (1982) (emphasis added).

5. As amended in 1982, Section 5a(11) read: contract markets shall

> Provide a fair and equitable procedure through arbitration or otherwise (such as by delegation to a registered futures association having rules providing for such procedures) for the settlement of customers' claims and grievances against any member or employee thereof: *Provided,* That (i) the use of such procedure by a customer shall be voluntary and (ii) the term "customer" as used in this subsection shall not include another member of the contract market....

7 U.S.C. § 7a(11) (1983).

6. The Chairman stated that "the Commission has interpreted the contract market arbitration provisions of 5a(11) of the Act to require a member or employee of an exchange against whom a customer has a claim to arbitrate that claim if the customer wishes to do so." 1982 Senate Hearings at 67. The Chairman further informed Congress that:

> [r]elying upon its interpretation of Section 5a(11) the Commission recently disapproved the rules of one contract market and required

During this interim period, the CBOT's appeal in *CBOT v. CFTC* reached this Court. We did not reach the substantive issues involved, but reversed the lower court on ripeness grounds. *CBOT v. CFTC*, 704 F.2d at 932–933; see also *supra*, at 312. As a result, the CBOT was compelled to distribute Regulation 620.-01(B), as altered by Commission Rule 7.201, to its members. The CBOT, however, added the following footnote in its rulebook:

> The following is the text of Regulation 620.01(B) as amended by CFTC Rule 7.201. The legality of Rule 7.201, and thus the obligation of Board of Trade members to arbitrate customer's claims and grievances, has been the subject of litigation between the Board of Trade and the CFTC. In 1982, the United States District Court for the Northern District of Illinois declared the Rule invalid, holding that CFTC Rule 7.201 is an unconstitutional denial of the right to a jury trial. However, on April 5, 1983, the Seventh Circuit Court of Appeals held that the case was not yet "ripe" for adjudication. While the Court did not rule on the merits, the Court went on to say: "Moreover, the Board need not flout the rule in order to challenge its validity. A member or employee ordered by the Board or the Commission to arbi-

> the [CBOT] exchange to adopt a rule that a member or employee of the contract market must arbitrate at the behest of the customer. You should be aware, however, that the exchange has taken the position that the Commission's interpretation unconstitutionally deprives the member or employee of his right to jury trial protected by the Seventh Amendment to the Constitution and has challenged the Commission's action affecting its rules. *Board of Trade of the City of Chicago v. Commodity Futures Trading Commission*, No. 81-C–7175 (McMillen, J.). Although the Commission argued that its interpretation was consistent with the language and purposes of Section 5a(11), the court agreed with the exchange and entered an order declaring the Commission's interpretation regarding the mandatory arbitration requirement to have violated the Seventh Amendment right to jury trial of members of the exchange.

*Id.*

trate under Rule 7.201 could simply bring a suit to enjoin arbitration or to enjoin enforcement of an arbitration award against him on the ground that the Commission's rule requiring arbitration is invalid."

*Rules and Regulations*, Board of Trade of the City of Chicago ("*CBOT Rules and Regulations*"), Regulation 620.01.

The CBOT took our dictum in *CBOT v. CFTC* literally and in the above-quoted footnote presented it verbatim as advice to members on how to challenge the rule. This case involves such a challenge. Geldermann, the plaintiff and a member of the CBOT, refused to arbitrate a customer-initiated claim by FSI under Regulation 620.-01(B). The CBOT, despite its objections to the Regulation, is required by the CEA to enforce its rules. 7 U.S.C. § 7a(8). Failure to enforce its rules would subject the CBOT to a civil penalty and fines up to $100,000 and would subject CBOT officials to criminal prosecution and, upon conviction, fines and/or imprisonment. 7 U.S.C. § 13(a). Thus the CBOT attempted to force Geldermann to proceed with arbitration. Geldermann's continued refusal to submit to arbitration violated a regulation of the CBOT, the CEA and the CFTC rule. Each such violation subjected Geldermann to disciplinary proceedings. *CBOT Rules and Regulations*, Regulations 500.00 and 505.00. Geldermann was also subject to potential penalties which include fines, suspension and expulsion from the Exchange. *CBOT Rules and Regulations*, Regulation 560.00.

To forestall these severe consequences, Geldermann filed suit against the CBOT, CFTC and FSI in federal court seeking to enjoin the CBOT from requiring Geldermann to arbitrate its customer's claim. Geldermann challenged Section 5a(11) of the Act, Commission Rule 7.201 and CBOT Regulation 620.01(B) as violative of its constitutional rights under the Seventh Amendment and Article III.

Rejecting the Commission's interpretation of Section 5a(11), the district court concluded that Section 5a(11) of the CEA did not, in and of itself, require Gelder-

mann to arbitrate its customers' claims; therefore, because the district court did not view the mandatory arbitration as congressionally imposed, the court did not consider the constitutionality of Section 5a(11). *Geldermann v. Board of Trade of the City of Chicago*, No. 85 C 07350, slip op. at 7 (N.D.Ill. Dec. 30, 1986) [Available on WESTLAW, 1986 WL 15102]. Instead, the district court considered the constitutionality of Rule 7.201 and Regulation 620.01(B) and held that each violated Geldermann's Seventh Amendment right to a jury trial. In dictum, the court indicated that the Rule and Regulation also appeared to violate Article III. *Id.* at 13. We disagree with this approach as well as the district court's ultimate holding regarding the constitutionality of CFTC Rule 7.201 and CBOT Regulation 620.01(B).

■ First, the district court erred by failing to accept the well established canon "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed. 2d 694 (1984); see also *Schor*, 106 S.Ct. at 3254; *Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371 (1969); *Blinzinger v. Lyng*, 834 F.2d 618, 620 (7th Cir.1987). This principle directs courts to give considerable weight to the CFTC's contemporaneous and consistently held position that Section 5a(11), in accord with its terminology, requires commodity exchange members to submit to customer-initiated arbitration. Instead, with no apparent deference to the statutory language or the CFTC's interpretation of the statutory scheme that it is entrusted to administer and without analysis of the legislative history of the Act, the district court simply concluded that Section 5a(11) "does not ... require the CFTC to pass a mandatory arbitration regulation. The CFTC could have passed a regulation providing that arbitration could proceed only if both broker and customer agreed." *Geldermann*, No. 85 C 07350, slip op. at 7. This conclu-

sory dismissal of the Commission's interpretation fails to adhere to the standard of deference enunciated by the Supreme Court in *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782.

Second, in addition to the language of Section 5a(11), an examination of the legislative history of the Act shows that deference to the CFTC's interpretation is especially warranted because Congress has twice amended the CEA since the CFTC declared by regulation its interpretation of Section 5a(11)[7] and has not overturned the CFTC's position. "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Schor*, 106 S.Ct. at 3255 (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)).

Finally, to sustain the CFTC's interpretation there is no need to rely simply on canons of statutory construction or find tacit approval of the CFTC's position in congressional silence. When Congress amended the Act in 1978, it explicitly stated that it was not affecting "the Commission's understanding that exchange members must participate in arbitration proceedings which the customer has elected to pursue." See *supra* at 314. At the time Congress made this statement in support of the Commission's interpretation, it was of course cognizant of the contrary interpretation asserted by the CBOT and adopted by the district court in *CBOT v. CFTC*. See *supra* at 314 n. 6.

In view of the abundant evidence that Congress intended to require exchange members to submit to customer-initiated arbitration proceedings, it is next necessary to address the question whether Section 5a(11) violates Article III.

## II. *Article III of the Constitution Is Not Transgressed by Arbitration Here.*

Article III, § 1 of the Constitution directs that "[t]he judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish ..." and provides that these federal courts shall be staffed by judges who hold their offices during good behavior and whose compensation shall not be diminished during their tenure in office. Geldermann and the CBOT contend that Section 5a(11) of the CEA, CFTC Rule 7.201 and CBOT Regulation 620.01(B) all violate Article III insofar as they force Geldermann to submit to the resolution of customer claims against it by arbitrators who are not afforded the tenure and salary protections of Article III.

### A. *Waiver of Article III's Personal Guarantees*

"Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate procedures by which civil and criminal matters must be tried." *Schor*, 106 S.Ct. at 3256. Therefore, the first question to consider is whether Geldermann waived its right to an Article III adjudication by consenting to submit to arbitration.

The district court found that Geldermann did not "knowingly, intentionally and voluntarily" waive its constitutional rights to an Article III forum and a jury trial. *Geldermann*, No. 85 C 07350, slip op. at 10, 13. However, both the facts of this case and the applicable law demonstrate that Geldermann did indeed consent to arbitration; therefore Geldermann cannot now complain that it is deprived of any claimed constitutional rights it might have had.

The district court rejected the evidence that Geldermann consented to arbitration because the court characterized the membership agreement between Geldermann and the CBOT as a contract of adhesion.

---

**7.** Congress again amended the CEA in the Futures Trading Act of 1986 (100 Stat. 3556) without altering the CFTC's construction.

It stated: "[w]here the parties to this contract the (CBT and Geldermann) are of such grossly unequal bargaining power, this court cannot consider Geldermann's agreement to the contract to be a 'voluntary' waiver of its constitutional rights." *Geldermann,* slip op. at 11. The court's finding that the parties ·were of "such grossly unequal bargaining power" is incredible in light of Geldermann's statement in its supporting affidavit that, measured by the customer balances it carries, Geldermann is reputed to be the largest commodity broker in the United States.

 The district court also rejected the evidence of Geldermann's consent to arbitration because "[i]f it [Geldermann] was to continue in business, Geldermann had no choice but to accept the CBT's rules and regulations." *Id.* On this point, the court ignored the clear mandate of *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed. 2d 409 (1985), regarding what constitutes consent to arbitration procedures.

*Thomas* concerned the data-sharing provision of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 135 *et seq.* As a precondition to registration of a pesticide under FIFRA, manufacturers must submit research data to the Environmental Protection Agency ("EPA") concerning the product's health, safety and environmental effects. The 1972 Act established data-sharing provisions to streamline pesticide registration procedures, to increase competition, and to avoid unneces-

sary duplication of data generation costs. These data-sharing provisions both authorized the Administrator of the EPA to use data submitted by prior registrants to support the registration of "me-too" or "follow-on" registrants and established a scheme for sharing the costs of data generation. *Thomas,* 105 S.Ct. at 3328. Congress viewed this data sharing as essential to the registration scheme, *id.* at 3329 (citing S.Rep. No. 95–334 at 7 (1977)), but the then current system, which required the EPA to determine the proper compensation when the data-generating and follow-on registrants could not agree on an amount, proved unworkable.

In response, Congress amended FIFRA in 1978. For those conflicts in which the data-generating and follow-on registrants could not agree on an amount of compensation, Congress replaced the system of EPA determination with mandatory arbitration.[8] Under the new system, any follow-on registrant who fails: (1) to agree on compensation with the data-generating registrant, (2) to participate in arbitration or, (3) refuses to comply with the terms of the agreement or arbitration decision, has its application denied or its registration canceled without further hearing. 7 U.S.C. § 136a(c)(1)(D)(ii).

If the EPA Administrator determines that an applicant has failed to participate in arbitration, the Administrator will deny the application or cancel the registration of the pesticide in support of which the data was used. If the follow-on registrant wants to enter or continue in business, it has no

---

**8.** Under amended Section 3(c)(1)(D)(ii):

... the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the "applicant") ... only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator.... The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such an agreement, binding arbitration under this subparagraph.... If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subpara-

graph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application.... *[I]f the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing.*

7 U.S.C. § 136a(c)(1)(D)(ii) (emphasis added).

**318**

choice but to accept the EPA's rules and regulations, including the arbitration compensation scheme. Thus under FIFRA, an applicant has the option of participating in the arbitration scheme or going out of business. Yet despite this economic compulsion, the Supreme Court held that "the follow-on registrant ... explicitly consents to have his rights determined by arbitration." *Thomas,* 105 S.Ct. at 3339. The Court found this explicit consent in the follow-on registrant's submission to the requirements of FIFRA Sections 3(c)(1)(D) and 3(c)(2)(D). *Id.* See 40 C.F.R. § 162.9–5(b) (1984).

In light of *Thomas,* the district court's finding that if Geldermann was to continue in business it had no choice but to accept the CBOT's rules and regulations has no impact on the question of Geldermann's consent to follow all of the rules of the CBOT, including the arbitration rules. Thus none of the district court's objections counter our holding that Geldermann consented to participate in customer-initiated arbitration proceedings.

The district court's objections aside, the facts of this case as well as the applicable law clearly establish that Geldermann did indeed consent to arbitration. Geldermann is a member of the CBOT, a body this Court has previously determined to be a "voluntary association." See *Rosee v. Board of Trade of the City of Chicago,* 311 F.2d 524, 525 (7th Cir.1963). As a precondition of membership, Geldermann signed "a written agreement to observe and be bound by the Charter, Rules and Regulations of the Association, and all amendments subsequently made thereto." *CBOT Rules and Regulations,* Regulation 205.00.

Subsequent to Geldermann's signing of the agreement and its admission as a CBOT member, the CBOT amended its rules to include Regulation 620.01(B). By virtue of its prior agreement, Geldermann consented to observe and be bound by the terms of Regulation 620.01(B), which unambiguously require Geldermann to arbitrate customer-initiated claims. In addition, Regulation 601.00 expressly provides:

Arbitration of Customers' Claims and Grievances—The Board shall by regulation establish procedures in conformity with Section 5a(11) of the Commodity Exchange Act and Regulations thereunder for the settlement through arbitration of customers' claims and grievances against members and their employees. Every member, *by becoming such,* agrees to abide by all regulations prescribed by the Board pursuant to this rule, and further agrees to abide by and perform any award made thereunder.

*CBOT Rules and Regulations,* Regulation 601.00 (emphasis added).

Yet Geldermann asserts that it never consented to be bound by this rule—that CBOT membership alone is not sufficient to constitute consent to arbitration and therefore cannot establish a waiver of its constitutional right to an Article III forum. A review of the relevant case law, however, indicates that similar arguments by members of the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") have been uniformly rejected.

In *Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics, Inc.,* 819 F.2d 400 (3d Cir.1987), plaintiff Patten was a member of the NASD, and as such had agreed to " 'abide by, comply with, and adhere to the ... Bylaws, the rules and regulations of the [NASD] as they are or may from time to time be adopted, changed or amended....' " *Id.* at 405 (quoting *NASD By-laws,* Art. III, Sec. 1(a)(1)). The NASD adopted a code of arbitration procedure which provided that any dispute " 'shall be arbitrated under this Code, as provided for by any duly executed and enforceable written agreement or upon the demand of a customer.' " *Id.* at 406 (quoting *NASD Code of Arbitration Procedure,* Part III, Sec. 12(a), P3712, *reprinted in NASD Manual* (CCH) 3613–3).

One of Patten's customers filed a statement of claim against Patten with the NASD Director of Arbitration. The NASD accepted the claim and, according to its procedure, initiated arbitration proceedings. In response, Patten filed a complaint

in the district court and moved for an order compelling the customer to discontinue the NASD arbitration. The district court denied the order. The Third Circuit affirmed, holding that: "It is therefore clear that ... [the customer] can demand NASD arbitration of its disputes with Patten by virtue of 412(a), and *Patten is compelled by its NASD membership* to submit even absent a specific contractual arbitration undertaking directly with [the customer]." *Id.* at 406 (emphasis added). Thus Patten was compelled by virtue of its NASD membership to arbitrate its customer's claim.

In a parallel case, the defendants in *Paine, Webber, Jackson & Curtis v. Chase Manhattan,* 728 F.2d 577 (2d Cir.1984), non-members of the NYSE, sought to compel plaintiff Paine Webber, a member of the NYSE, to submit its claim against the defendants to NYSE arbitration. The defendants did not claim that they had an agreement with Paine Webber requiring the submission of disputes between them to arbitration. Rather they relied exclusively on the Constitution and Rules of the NYSE which require NYSE members to submit to arbitration any controversies with non-members arising out of the member's business. *Id.* at 579.

The district court found that the parties had not indicated any intention to be bound by the NYSE arbitration provisions and, in the absence of such an agreement between the parties requiring arbitration, Paine Webber could not be compelled to arbitrate its claims. *Id.* at 580. On appeal, the Second Circuit rejected this analysis. Contrary to the district court, the reviewing court held that membership in the NYSE, with its concommitant obligation to be governed by the Constitution and Rules of the NYSE, was sufficient to constitute consent to arbitration. The court stated: "we believe that *the arbitration provisions of the NYSE Constitution and Rules are sufficient in and of themselves to compel arbitration* of covered disputes under § 3, whether or not they are incorporated in a purchase and sale agreement." *Id.* The Second Circuit nevertheless upheld the result that arbitration could not be compelled in that case because the dispute at issue was not a covered dispute. The court's holding that the arbitration provisions of the NYSE Constitution and Rules are sufficient in and of themselves to compel arbitration of covered disputes was consistent with past decisions of that court. See, *e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,* 726 F.2d 1286, 1288–1289 (2d Cir.1984) (despite inapplicability of specific NYSE employee arbitration rule, provision of NYSE Constitution allowing non-members to compel arbitration of any controversy "arising out of the business" of a member was sufficient to compel member to arbitrate employee's claims); *Coenen v. R.W. Pressprich,* 453 F.2d 1209, 1211–1212 (2d Cir.1972) (member signed a pledge to abide by the entire Constitution which contained an arbitration provision; the court held that "one desiring the benefits of membership in the New York Stock Exchange must be willing to live up to the responsibilities of such membership" and therefore ordered the member to arbitrate); *Axelrod & Co. v. Kordich, Victor & Neufeld,* 451 F.2d 838, 840–841 (2d Cir.1971) (by virtue of member's agreement to be governed by the NYSE's Constitution, non-member broker-dealer firm may invoke the compulsory arbitration rules of the NYSE over the opposition of a member firm). Consistent with the parallel rulings of the Second and Third Circuits we hold that by virtue of its continued membership in the CBOT, Geldermann consented to the resolution of claims against it in customer-initiated arbitration proceedings.[9]

---

9. We recognize that our holding may seem to present a catch–22 situation in which a CBOT member's claim against arbitration will always be either not ripe for adjudication or waived. For example, our dictum in *CBOT v. CFTC* suggested that the CBOT's jurisdictional problem satisfying the ripeness requirement might be solved in a suit brought by a member to enjoin arbitration. *CBOT v. CFTC,* 704 F.2d at 933. Yet now, when a member brings such a suit, we hold that its status as a member solves the procedural problem but waives its substantive claim. But this is not really a catch–22 situation because Geldermann could have satisfied the ripeness requirement and preserved its constitutional claim by resigning its membership in the CBOT. When viewed in the context of the highly regulated commodities industry, this is

Yet Geldermann questions its "voluntary" consent to a rule which was added to the CBOT's rule book over the exchange's protest. It is indisputable that the CBOT has strenuously and repeatedly objected to mandatory arbitration. The CBOT adopted Regulation 620.01(B) under compulsion and the CBOT amended the Regulation to include a disclosure of its questionable legality and a description of the procedure by which a member might challenge the Regulation, see *supra* at 314. But Geldermann itself has not consistently objected to customer-initiated arbitration proceedings under the Regulation. In fact a review of the factual background that produced the particular arbitration dispute underlying this case highlights the manner in which Geldermann's objection in this case resembles the belated, self-serving objection of the plaintiff in *Schor.*

Defendant FSI is not a party in this appeal, but was the party that brought the underlying arbitration demand. FSI is a futures commission merchant, but is not a member of the CBOT and thus cannot clear its customers' trades itself. Until May 1985, FSI maintained an omnibus account with Geldermann and conducted its customer trading on the CBOT through that account. In April 1985, pursuant to Rule 7.201 and Regulation 620.01(B), FSI initiated an arbitration proceeding against Geldermann for Geldermann's alleged failure to fill an FSI purchase order properly. Geldermann submitted to FSI's demand for arbitration of this claim without raising any objection regarding the constitutionality of the Rule and Regulation or claiming that it had not consented to be bound by the Rule and Regulation. The parties arbitrated the claim and Geldermann lost. The arbitrator awarded FSI $54,718.

Shortly after the arbitration, Geldermann notified FSI that it was terminating FSI's account and requested that FSI make immediate arrangements to transfer all of its open positions to another CBOT member firm. FSI arranged to transfer its open positions and, in effectuating the transfer, Geldermann charged FSI the full round-turn commission for each open position transferred. In May 1985, FSI again initiated an arbitration proceeding against Geldermann for money damages for three claims, including a claim for interest due FSI as a result of Geldermann's late payment of the first arbitration award. This time Geldermann objected by filing this suit. See *supra* at 315.

Under a separate provision of the CEA, the plaintiff in *Schor* acted similarly. The CEA, in addition to providing for arbitration as an alternative to federal litigation, also provides a CFTC reparations proceeding to handle customer complaints. In that case plaintiff Schor invoked the CFTC's reparations jurisdiction by filing complaints against the defendant Conti with the CFTC. Before receiving notice that Schor had commenced the reparations proceeding, Conti filed a diversity action in federal district court to recover a debit balance in Schor's account. Schor counterclaimed in the district court action but moved on two separate occasions to dismiss or stay the district court action, arguing that the CFTC reparations proceeding would fully resolve and adjudicate all the rights of the parties with respect to the transactions which were the subject matter of the district court action. Although the district court declined to stay or dismiss the suit, Conti voluntarily dismissed the federal court action and presented its debit balance claim by way of a counterclaim in the CFTC reparation proceeding initiated by Schor. In the reparations proceeding, the Administrative Law Judge ("ALJ") ruled against Schor on

---

not such an extreme step to demand in order to retain a constitutional right. Geldermann receives substantial benefits from the highly regulated nature of the industry. Kevin Mack, the president of Geldermann, stated in his affidavit, "the market activities of member firms under the Act are subject to the constant scrutiny of the exchange's surveillance and disciplinary system, a circumstance reassuring to significant commercial entities." It is reasonable to infer that the significant commercial entities that are Geldermann's customers also find it reassuring that they can, under the rules of the exchange, compel Geldermann to arbitrate claims they have against it. Geldermann cannot continue to have the benefits of membership while refusing to accept its concomitant responsibilities.

both his claim and on Conti's counterclaim. Only after losing did Schor, for the first time, challenge the CFTC's statutory authority to adjudicate Conti's counterclaim. *Schor*, 106 S.Ct. at 3250–3251.

The Supreme Court held that Schor waived his right to an Article III forum because he demanded that Conti proceed on its counterclaim before the CFTC rather than in district court and "was content to have the entire dispute settled in the forum he selected until the ALJ ruled against him on all counts; it was only after the ALJ rendered a decision to which he objected that Schor raised any challenge...." *Id.* at 3257. By initiating the reparations proceeding and expressly demanding that Conti proceed on its counterclaim in the reparations proceeding rather than before the district court, "Schor indisputably waived any right he many have possessed to the full trial of Conti's counterclaim before an Article III court." *Id.*

While Geldermann's consent to arbitration may not be as "indisputable" as Schor's consent to the adjudication of Conti's state law counterclaims in the CFTC reparations proceeding because Geldermann did not initiate and insist upon arbitration of this claim, comparison of the circumstances in which Geldermann and Schor first objected to the non-Article III adjudication of their claims supports our conclusion that Geldermann consented to customer-initiated arbitration under Regulation 620.01(B). Both Schor and Geldermann were content to have their disputes settled by a non-Article III forum until they lost. Both challenged the constitutionality of the Act only after an arbitration or reparations panel ruled against them. We conclude that both consented to adjudication by a non-Article III forum.[10]

B. *Non-waivable Article III Interests*

■ Our holding that Geldermann consented to arbitration, and thus waived any

right he may have possessed to a full trial before an Article III court, is not completely dispositive of the issue. "Article III, § 1 not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as 'an inseparable element of the constitutional system of checks and balances.'" *Schor*, 106 S.Ct. at 3257 (quoting *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58, 102 S.Ct. 2858, 2864). To the extent that this structural principle is implicated, notions of consent and waiver are not controlling because the guarantees of Article III serve institutional interests that the parties cannot be expected to protect. *Schor*, 106 S.Ct. at 3257–3258.

■ However, the Supreme Court deliberately has not provided rules to determine when a given congressional decision to authorize the adjudication of Article III matters in a non-Article III forum implicates the structural principle of institutional integrity and overrides the consent of the parties. The Court has stated that "[a]lthough such [formalistic and unbending] rules might lend a greater degree of coherence to this area of the law, they might also unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Id.* at 3258. In avoiding unbending strictures the Court has "also been faithful to [its] precedents, which counsel that bright line rules cannot effectively be employed to yield broad principles applicable in all Article III inquiries." *Id.* at 3261. Accordingly, "in this area of 'frequently arcane distinctions and confusing precedents,'" *Thomas*, 105 S.Ct. at 3334 (quoting *Northern Pipeline*, 102 S.Ct. at 2881), we are left without a clear picture of when a particular congres-

10. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), is not to the contrary. In that case the litigants did not consent to a non-Article III adjudication of their claims. As stated in *Thomas, Northern Pipeline* does not hold that the right to an Article III forum is absolute unless the federal government is a party. *Thomas*, 105 S.Ct. at 3336. Also, the scope of jurisdiction of exchange arbitrators is limited to customer-broker claims arising out of exchange transactions in contrast to the bankruptcy court's broad jurisdiction in *Northern Pipeline*.

sional plan implicates this structural principle of institutional integrity.

Despite the express refusal of the Court in *Schor* to formulate bright line rules to follow in this area generally, the similarities between the congressional plans attacked by Schor and Geldermann make the analysis in *Schor* the most pertinent guide for us in this case. The plaintiffs in both *Schor* and this case challenged the CEA, particularly Congress' power to allow the adjudication of state common law claims in a non-Article III forum [11] under CEA Sections 14 and 5a(11). Both the reparations procedure at issue in *Schor* and the arbitration procedure at issue here were created by Congress to provide inexpensive and expeditious alternative forums in which customers could settle their claims against professional brokers. In each instance Congress gave the CFTC or arbitrators the authority to adjudicate such matters but left entirely to the complaining parties the decision to invoke either forum. See *Schor*, 106 S.Ct. at 3260. In support of these delegations, the Court in *Schor* stated that, "[i]n such circumstances, separation of powers concerns are diminished, for it seems self-evident that just as Congress may encourage parties to settle a dispute out of court or resort to arbitration without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing participants may, at their option, elect to resolve their differences." *Id.* From the above-quoted language it appears that the Supreme Court would view the congressional scheme of allowing commodity customers the option of electing arbitration as intruding on the province of the judiciary even less than the reparations procedure in *Schor*. To justify the reparations procedure challenged in *Schor*, the Court analogized it to a situation in which the legislature encouraged parties to arbi-

trate; a situation for which the Court believed it was self-evident that no impermissible incursion on the separation of powers was involved. Under Section 5(a)(11), Congress provides commodity customers the option of electing arbitration. Provision of this option does not violate the separation of powers.

The fact that the non-Article III forum challenged is arbitration is also of importance. Recently in a case arising in the related securities industry, the Supreme Court reaffirmed that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, establishes a " 'federal policy favoring arbitration.' " *Shearson/American Express, Inc. v. McMahon,* —— U.S. ——, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). The Court of Appeals for the District of Columbia found that:

> [t]he rationale for this policy is at its strongest where the arbitration will be governed by procedures specifically tailored to the context from which the agreement to arbitrate arises, and will be conducted by arbitrators who are expert in the norms and practices of the relevant industry. Labor arbitration is one such context. The arbitration system of the New York Stock Exchange is another.

*Pearce v. E.F. Hutton Group, Inc.,* 828 F.2d 826 (D.C.Cir.1987). We agree and add a third system to the securities and labor list—the arbitration system of the Board of Trade of the City of Chicago. Providing arbitration as an option for customers with complaints against members of the CBOT is consistent with the strong federal policy favoring that method of disposition.

We recognize that although the federal scheme of providing commodity customers

---

**11.** Although the claims in both cases were state law claims, actual or potential diversity jurisdiction existed. The plaintiff on the counterclaim in *Schor* had originally brought the claim in federal court on the basis of diversity jurisdiction. *Schor*, 106 S.Ct. at 3258. It also appears diversity exists between Geldermann, an Illinois corporation, and FSI, a New York corporation.

However, we note that if, in the absence of an available arbitration procedure, FSI chose to file in Illinois state court rather than in federal court, as a resident defendant, Geldermann could not remove the suit to federal court, 28 U.S.C. § 1441(b), and without any violation of the Constitution would be foreclosed from an Article III forum.

the option of demanding arbitration of their claims is consistent with the federal policy favoring arbitration, in this case it is state law that authorizes and defines arbitration and state courts that enforce arbitration awards. See, *e.g.,* Ill.Rev.Stat. ch. 10, § 101 *et seq.* (1985) (the Uniform Arbitration Act). The arbitration rules and regulations adopted by the CBOT in response to Section 5a(11) acknowledge state control in this area and specifically incorporate and comply with the Uniform Arbitration Act of Illinois, *CBOT Rules and Regulations,* Regulations 601.00, 603.06 and 640.05. Therefore, through the operation of Section 5a(11) and the CBOT regulations, Congress is here requiring the Illinois state arbitration system and Illinois state courts to assist in the administration of a federal scheme.

Although having the states actively participate in implementing a federal program appears unique, a similar scheme was upheld in *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). There the statute challenged by the state of Mississippi required the use of state regulatory machinery to advance federal energy goals. The Supreme Court upheld the requirement that the Mississippi Public Service Commission adjudicate disputes arising under the federal statute because "the policy of the federal Act is the prevailing policy in every state" and should be respected accordingly. *Id.* at 760, 102 S.Ct. at 2138 (quoting *Testa v. Katt,* 330 U.S. 386, 393, 67 S.Ct. 810, 814, 91 L.Ed. 967 (1947)). Consistent with this Supreme Court precedent, Congress and the CBOT can require the Illinois arbitration apparatus and Illinois state courts to administer customer-initiated arbitration allowed under the CEA.

Finally, a holding that Section 5a(11) implicates the structural principle of institutional integrity and thus violates Article III would not prevent customers, despite the objection of CBOT members, from removing commodity cases from the reach of an Article III forum. All such cases, including state law counterclaims, could still be heard by the CFTC in reparations proceedings without violating the Constitution. See *Schor,* 106 S.Ct. at 3260.

For the reasons set forth above, we hold that neither Section 5a(11) nor CFTC Rule 7.201 nor CBOT Regulation 620.01 threatens the structural integrity of the courts or the separation of power between the branches of the federal government. Therefore Geldermann's waiver of its personal right to an Article III forum is binding. Compelling Geldermann to arbitrate FSI's claims against it does not violate Article III.

### III. *Arbitration Here Does Not Implicate the Seventh Amendment.*

■ Geldermann also contends that the mandatory customer-initiated arbitration plan violates its right to a jury trial under the Seventh Amendment. Because the district court held that Section 5a(11) does not require the CFTC to promulgate mandatory arbitration rules, it did not evaluate the constitutionality of the CEA, but only whether CFTC Rule 7.201 and CBOT Regulation 620.01(B) violate the Seventh Amendment. *Geldermann,* No. 85 C 07350, slip op. at 7. It held that both violate Geldermann's rights under the Seventh Amendment. We reverse.

In addressing Geldermann's two contentions, that the mandatory arbitration violated his rights under Article III and the Seventh Amendment, the district court appears to have considered the two challenges as independent and alternative grounds for relief. It first addressed Geldermann's Seventh Amendment challenge; then, having ruled that the arbitration plan violated that Amendment, the court concluded that it "need not address Geldermann's Article III claim." *Id.* at 13. The district court resolved the problem backwards. The court should have first addressed the issue of whether Geldermann had the right to an Article III forum; then if it ruled that no such right existed, it need not have addressed Geldermann's Seventh Amendment claim. In a non-Article III forum the Seventh Amendment simply does not apply. See, *e.g., Atlas Roofing Co., Inc. v. Occupational Safety and Health*

*Review Commission,* 430 U.S. 442, 449–461, 97 S.Ct. 1261, 1266–1272, 51 L.Ed.2d 464 (1977) (action for civil penalties before Occupational Safety and Health Review Commission not jury triable of right); *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48–49, 57 S.Ct. 615, 629–630, 81 L.Ed. 893 (1937) (Seventh Amendment does not apply to suit for backpay before National Labor Relations Board); see also Note, *Article III Implications for the Applicability of the Seventh Amendment to Federal Statutory Actions,* 95 Yale L.J. 1459, 1459–1460 (1986). Because we hold that Geldermann is not entitled to an Article III forum, the Seventh Amendment is not implicated.

REVERSED.