Dale REICKS and Ardwin
Reicks, Appellees,

v.

FARMERS COMMODITIES CORP.,
John L. Brannaman, Jack Figley,
and Harold Richard, Appellants.

FARMERS COMMODITIES CORP.,
John Brannaman, Harold Richard,
and Jack Figley, Appellants,

v.

Dale REICKS and Ardwin
Reicks, Appellees.

No. 90–691.

Supreme Court of Iowa.

Sept. 18, 1991.

Mark E. Schantz of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellants.

Christopher F. O'Donohoe and Richard D. Stochl of O'Donohoe, O'Connor & O'Donohoe, New Hampton, for appellees.

HARRIS, Justice.

This appeal is from the district court's denial of an application to vacate arbitration awards against commodity brokers, and entry of judgments on those awards. The brokers contend they were denied due process because the arbitration decision did not state the reasons for the award, the hearing was procedurally unfair and there was misconduct prejudicing its rights, and the awards were in manifest disregard of the law and unsupported by substantial evidence. We affirm.

Ardwin and Dale Reicks, father and son, conduct extensive hog operations. Though the operations are separate, the Reicks work together in managing them.

Farmers Commodities Corporation (FCC) is a Des Moines commodities brokerage firm. Its customers are primarily grain operators who use the commodities futures market to "hedge" their position in the

cash market for grain. FCC began offering a program of marketing advice for grain and livestock farmers. This program made some of the marketing techniques for its usual customers available to farmers. The program was called "Farmers Marketing Resources."

John Brannaman is an FCC employee. Jack Figley is vice president of administration. Figley and Harold Richard are supervisors of John Brannaman.

"Hedging," as the term is used in this litigation, refers to a procedure whereby, when buyers purchase a commodity—such as grain—they also sell on the board of trade for future delivery (at the same time set for delivery of the grain) a sufficient quantity to cover the purchase. This way, whether price increases or decreases, the gain on one transaction offsets the loss on the other. In other words the participant takes equal and opposite positions in the cash and futures market. The practice is not new. *See Bolfing v. Schoener*, 144 Minn. 425, 426–29, 175 N.W. 901, 901–02 (1920).

"Rolling hedges" refers to a practice of placing a futures position in a contract month which matures before the product is expected to be marketed. Later in the year the position is lifted and shifted to a later contract. A rolling hedge involves more risk. Hedges can also be rolled backward.

At the suggestion of the Reicks' banker, they met with Brannaman to discuss hedging and the rolling hedge technique, a matter concerning which the Reicks had, at most, decidedly limited knowledge. The Reicks thereafter proceeded with numerous investments in the commodities market under the guidance of FCC—with disastrous results. Both Ardwin and Dale had to pay vast sums representing money borrowed to offset margin calls. They allege this was necessitated by FCC's mishandling of funds and bad advice.

Federal law requires a brokerage firm such as FCC to register as a "futures commission merchant." If a customer has a claim against a futures commission merchant, and if a customer chooses to submit to arbitration of the claim under the aus-

pices of the National Futures Association rather than proceeding with court litigation, the futures commission merchant is compelled to submit to arbitration. *See* 17 C.F.R. §§ 170.8, 170.15, 180.3.

The Reicks each did demand arbitration. FCC places strong emphasis on the fact that, when the Reicks did so, it had no choice but to submit. The proceedings culminated in an award of $104,332.80 for Dale and an award of $129,446.49 in favor of Ardwin. FCC challenged the proceedings in this action. It raises a number of complaints which are discussed in the following divisions.

■ I. Contracts have often provided a fertile field for tort claims. *See* W. Prosser & W.P. Keeton, *Law of Torts* § 92, at 663–64 (5th ed. 1984). This is such a case. Because a tort claim is involved, although the parties assume otherwise, Iowa Code chapter 679A (arbitration) is not involved. This renders moot a number of contentions of the parties, both of whom rely on chapter 679A to support their arguments. The chapter addresses only written contracts for arbitration, and specifically exempts "any claim sounding in tort whether or not involving a breach of contract." Iowa Code § 679A.1(2)(c). This dispute must be resolved under arbitration principles established by our common law. *See Jefferson County v. Barton–Douglas Constr.*, 282 N.W.2d 155, 157 (Iowa 1979) (arbitration agreements outside statutory framework governed by common-law principles). Under those principles judicial review is severely limited.

II. FCC first argues its

forced submission to binding arbitration in this case violated FCC's right to access to the courts, its right to a jury trial on legal claims (including a claim for fraud), its due process rights, and its right to equal protection of the laws.

■ We pass our grave doubts on whether error was preserved on this claim and reject it on its merits. As a commodities broker FCC may have been compelled to submit to binding arbitration, but no one compelled FCC to become a commodities

broker. *Cf. Bastone v. Dial–A–Home*, 100 Misc.2d 1026, 1027–28, 420 N.Y.S.2d 467, 467–68 (1979). Because FCC did consent to become a commodities broker, subject to the federal rule mandating binding arbitration, the case is not controlled by the rule that a party cannot, without agreeing, be required to submit to arbitration. *Hawkins/Korshoj v. State Bd. of Regents*, 255 N.W.2d 124, 127 (Iowa 1977).

■ In *Geldermann, Inc. v. Commodities Future Trading Commission*, 836 F.2d 310, 324 (8th Cir.), *cert. denied*, 488 U.S. 816, 109 S.Ct. 54, 102 L.Ed.2d 33 (1987), the court found no constitutional infirmity in the federal requirement that commodities brokers must submit to arbitration. Authorities to the contrary can be found, but in general they reflect a discredited view from former years when the courts cast a wary, and perhaps jealous, eye on what was then suspected of being an affront to judicial authority. *See, e.g., Dorchy v. Kansas*, 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686 (1923). The rule in more recent cases, the one which we strongly prefer and adopt, is that constitutionality of an arbitration is not compromised by the fact that one party is required to submit to it as a condition for entering a specific activity. *Country–Wide Ins. Co. v. Harnett*, 426 F.Supp. 1030 (S.D.N.Y.1977); *Firelock, Inc. v. District Court*, 776 P.2d 1090 (Colo.1989); *see generally* 5 Am. Jur.2d *Arbitration and Award* § 9, at 526 (1962); Annotation *Constitutionality of Arbitration Statutes*, 55 A.L.R.2d 432 (1957).

III. For a combination of reasons FCC contends the award was unfair, abusive, and contrary to law. Judged under the standards by which we review appeals from court proceedings, FCC might be said to have been treated unfairly, at least under its version of the facts. This is however no review of a court proceeding, or even of a decision on judicial review of administrative action.

On judicial review of administrative decisions (which is of course decidedly more narrow than our review of routine court actions), it is a ground for interference when the challenged action is unreasonable or arbitrary. Iowa Code § 17A.19(8)(g). But arbitration decisions are not so closely scrutinized. A refined quality of justice is not the goal in arbitration matters. Indeed such a goal is deliberately sacrificed in favor of a sure and speedy resolution. Under our common-law view the purpose of arbitration is to end disputes without court participation. It is no idle coincidence that the words "arbitration" and "arbitrary" are both derived from the same Latin word. Webster's New International Dictionary 110 (3d ed. 1964).

■ FCC's complaints include the fact that the arbitrator refused to give any explanation or reasons for its decisions. It is clear, though, no explanation of the award is required in arbitration proceedings. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 245 n. 4, 82 S.Ct. 1318, 1322 n. 4, 8 L.Ed.2d 462, 468 n. 4 (1962); *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 750 (8th Cir.1986); *Shearson Hayden Stone v. Liang*, 653 F.2d 310, 312 (7th Cir.1981) (citing *United Steel Workers of Am. v. Enterprise Wheel & Carr Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960); *Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 187, 98 L.Ed. 168, 176 (1953)). We note and approve the following:

> Arbitrators need not disclose the facts or reasons behind their award unless the arbitration agreement or submission, or an applicable statute, requires them to do so. Otherwise, they are no more bound to go into particulars, or to give reasons for their award, than a jury is for its verdict. When acting within the scope of their authority, being the chosen judges of the parties and the law unto themselves, they may award according to their notions of justice and without assigning any reason.

5 Am.Jur.2d *Arbitration and Award* § 126, at 614 (1962). We reached a similar conclusion in the early case of *McKnight v. McCullough*, 21 Iowa 111, 114 (1866).

■ IV. FCC complains also that the arbitration hearing was procedurally unfair, that its counsel were surprised by

issues and claims presented, that it was denied adequate notice and an opportunity to prepare defenses. FCC complains of the way in which discovery was conducted and evidence was received. Complaint was made of the fact that the hearing was held in Chicago.

These complaints overlook the extreme limitations of our review. These are matters solely within the province of the arbitrator, and outside our own. *City of Des Moines v. Central Iowa Pub. Employees Council*, 369 N.W.2d 442, 445 (Iowa 1985) (procedural questions should be left to the arbitrator); *Sergeant Bluff–Luton Educ. Ass'n v. Sergeant Bluff–Luton Community School Dist.*, 282 N.W.2d 144, 148 (Iowa 1979) (not the function of the court to determine whether the arbitrator resolved the grievance correctly); *Hawkins/Korshoj*, 255 N.W.2d at 128 ("courts ... have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim"). There was no error in the district court's refusal to reverse the arbitration award. Neither, on the basis of the court's highly circumscribed authority, was there error in refusing to entertain a challenge to the panel's make-up.

V. FCC argues for a "manifest disregard of the law" standard in reviewing arbitration matters. Under the federal arbitration act, federal courts overturn arbitrators' decisions when they are fundamentally irrational or in manifest disregard of the law. *Wilko*, 346 U.S. at 436–37, 74 S.Ct. at 187–88, 98 L.Ed. at 176. *See* annotation, *Vacation of Arbitration Award*, 20 A.L.R. Fed. 295, 365 (1974). The parties dispute whether this standard is different from the substantial evidence standard.

■ Application of either standard would not merit our interference here. A review of the record shows substantial evidence supporting the Reicks' allegations and no manifest disregard for the law. To reverse on the basis of either standard would be to disregard the Reicks' version of the facts.

Finally we find no merit in FCC's contention that the arbitrators improperly im-

posed liability on Richard and Figley for supervisory acts when there is no private cause of action for violations of 17 C.F.R. section 166.3.

We have not addressed but have considered and rejected a number of FCC's other contentions. To detail them would unduly extend this opinion.

AFFIRMED.