Stuart L. SAGAL, Individually and on behalf of himself and all others similarly situated, Plaintiff,

v.

FIRST USA BANK, N.A., Defendant.

No. Civ.A. 98–694–RRM.

United States District Court, D. Delaware.

Aug. 30, 1999.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Kenneth A. Elan, New York, New York, Joseph P. Garland, New York City, for plaintiff.

Somers S. Price, Jr., Potter Anderson & Corroon LLP, Wilmington, Delaware; Mark A. Aronchick, and John P. Lavelle, Jr., Hangley Aronchick Segal & Pudlin, Philadelphia, Pennsylvania, for defendant.

## OPINION

McKELVIE, District Judge.

This is a consumer deception case. Plaintiff is Stuart L. Sagal, a citizen and resident of the State of Maryland. He is suing on behalf of himself and all others similarly situated. Defendant is First USA Bank, N.A., a federally chartered banking association with its principal office in Wilmington, Delaware.

Sagal, a First USA credit card holder, transferred funds using a "Convenience Check" provided by First USA. After First USA assessed a $138 transaction fee, Sagal brought a class action suit asserting that First USA failed to clearly and conspicuously disclose its fee structure. Sagal bases his suit on numerous grounds, including on alleged violations of the federal Truth in Lending Act (TILA), 15 U.S.C. §§ 1632(a), 1637(c)(1)(B) (1994).

First USA filed a motion to dismiss Sagal's claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. In the alternative, First USA moves to stay the claim pursuant to § 3 of the Federal Arbitration Act (FAA), 9 U.S.C. § 3

(1994). First USA argues that a mandatory arbitration clause in the cardholder agreement precludes Sagal from bringing his suit. Sagal opposes the motion, answering that arbitration is fundamentally inconsistent with the purposes of the TILA. This is the court's decision on First USA's motion.

## I. *FACTUAL BACKGROUND*

■ The court draws the facts in this case from the complaint submitted by Sagal and from the affidavit of Donna Barrett submitted by First USA. This court considers the factual assertions raised by First USA because the allegations challenge the subject matter jurisdiction of this court. *See Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997). Moreover, when such a motion attacks the existence of subject matter jurisdiction in fact, no presumption of truthfulness attaches to the plaintiff's allegations. *See Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977).

The facts in this case are undisputed. Sagal states in his complaint that, in or about 1997, he received promotional material from First USA soliciting him to apply for a credit card. This solicitation offered a 3.9% interest rate for an introductory period, and highlighted the privilege of cardholders to write "Convenience Checks." Sagal states that in July 1997, after receiving the solicitation, he applied for and received a credit card issued by First USA. A Cardmember Agreement accompanied the card, explaining how First USA calculates finance charges for purchases, cash advances, and Convenience Checks. In particular, Sagal alleges that the Cardmember Agreement stated that First USA would impose a one-time Transaction Finance Charge for each use of a Convenience Check, with the charge amounting to 2% of the transaction amount.

The affidavit submitted by First USA states that the Cardholder Agreement contained an "Amendments" clause, providing:

> Amendments: We can amend the terms of this Agreement at any time. We will notify you of what these amendments are. Subject to the requirements of applicable law, any amendment to this Agreement will become effective at the time stated in our notice to you, and unless we specify otherwise, the amended terms of this Agreement will apply to all outstanding unpaid indebtedness in your Account as well as new transactions.

The affidavit submitted by First USA states that in or about January 1998, First USA mailed to existing cardholders, including Sagal, an amendment to the Cardholder Agreement which added an arbitration clause to the contractual terms. As alleged by First USA, the arbitration provision applies by its terms to all claims then existing or that might arise in the future, except to claims filed by March 1, 1998 and to class actions certified by that date. The clause provides that:

> Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the application of this arbitration clause or the validity of the entire agreement, shall be resolved by binding arbitration by the National Arbitration Forum.

First USA states that the amendment provided an opt-out procedure, whereby any cardmembers could reject the terms of the amendment by sending First USA written notification. First USA alleges that it did not receive such notice from Sagal.

Sagal states in his complaint that in the second half of 1998, he and numerous other cardholders received another written solicitation from First USA. The solicitation allegedly contained a number of Convenience Checks and repeatedly emphasized that the checks come with a 3.9% fixed annual percentage rate (APR). The solicitation also contained a postscript

written in fine print. Sagal alleges that the postscript stated that "[t]he Transaction Finance Charge for these Convenience Checks is equal to the greater of $5 or 3% of the amount of the purchase or check."

Sagal states that on or about October 28, 1998, he wrote a Convenience Check for $4600. On or about November 22, 1998, Sagal allegedly received his monthly credit card statement from First USA. The statement disclosed a transaction fee charge of $138, representing 3% of the $4600 transferred.

On December 11, 1998, Sagal filed a complaint instituting a class action suit. He filed an amended complaint on February 5, 1999. The amended complaint sets out five legal claims. First, Sagal asserts that First USA has violated the federal Truth in Lending Act (TILA) and the regulations promulgated pursuant to it by the Board of Governors of the Federal Reserve System. In particular, section 1637(c)(1)(B) of the Act requires that lenders "shall disclose clearly and conspicuously ... [a]ny fee imposed for an extension of credit in the form of cash." 15 U.S.C. § 1637(c)(1)(B) (1994). Regulation Z, which implements the TILA, similarly provides that disclosures of finance charges and annual percentage rates must be clear and conspicuous. 12 C.F.R. § 226.5(a) (1999). Sagal argues that First USA's solicitation failed to disclose the terms of the transaction fee in a clear and conspicuous manner, and that he and similarly situated people have sustained damage as a result.

Sagal's second claim is similar to his first, but is based on section 1632(a) of the TILA. This provision, as implemented by Regulation Z, requires that certain information, including finance charges, be clearly and conspicuously disclosed. 15 U.S.C. § 1632(a) (1994); 12 C.F.R. § 226.5 (1999).

Sagal's remaining claims are for breach of implied covenant of good faith and fair dealing, breach of contract, and violation of the Delaware Consumer Fraud Act, 6 Del.C. § 2513(a).

On February 12, 1999, First USA filed a motion to dismiss the suit or, in the alternative, to stay the case in favor of mandatory arbitration. First USA asserts that the arbitration clause contained in the amendment to the Cardmember Agreement requires that the suit be submitted to arbitration. First USA argues that the arbitration clause deprives the court of jurisdiction over the present dispute, and that the court should dismiss the suit pursuant to Rule 12(b)(1).[1] Alternatively, First USA argues that the court should stay the case pursuant to section 3 of the Federal Arbitration Act (FAA) in favor of mandatory arbitration. 9 U.S.C. § 3 (1994).

Sagal, in his answering brief, argues that enforcement of the arbitration clause is improper. He asserts that mandatory arbitration will preclude his right to bring a class action suit. Sagal indicates that Congress, having recognized that individual claims under the TILA are often too small to litigate, depends on class actions as a means to enforce the Act. As such, Sagal asserts that there is a conflict between the Federal Arbitration Act and the TILA, requiring the court to deny enforcement of the arbitration clause of the Cardmember Agreement.

## II. DISCUSSION

### A. Validity and Enforceability of the Arbitration Clause

■ The first step in the present inquiry is to determine if the arbitration clause of the Cardmember Agreement is valid and enforceable. See Harris v. Green Tree Financial Corp., 183 F.3d 173, 179–80 (3d Cir.1999) ("If ... a court deems a

---

1. Rule 12(b)(1) of the Federal Rules of Civil Procedure provides:

 (b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the

 responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter.

controverted arbitration clause a valid and enforceable agreement, it must refer questions regarding the enforceability of the terms of the underlying contract to an arbitrator, pursuant to section four of the FAA."); *Great Western Mortgage Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir.1997) ("In conducting this inquiry the district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid."). The FAA requires the court to look to principles of contract law to determine if arbitration clauses are valid and enforceable. *See* 9 U.S.C. § 2 (1994).

### 1. Conflict between the TILA and the FAA

 The sole argument raised by Sagal in his answering brief is that the mandatory arbitration clause is unenforceable because it frustrates the policies of the TILA. The Supreme Court has recognized that arbitration clauses may be unenforceable when Congress indicates that a federal law shall override the provisions of the FAA. *See Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). *McMahon* directs courts to deny enforcement of arbitration clauses when Congress indicates that a federal law shall override the provisions of the FAA. *See id.* ("Like any statutory directive, the Arbitration Act's mandate [to arbitrate statutory claims] may be overridden by a contrary congressional command."). In seeking to circumvent application of the FAA under *McMahon,* however, a party carries the burden of showing that Congress "intended to make an exception to the Arbitration Act" by "preclud[ing] a waiver of judicial remedies for the statutory rights at hand." *Id.* at 227. Congressional intent may be deduced from the statute's text, the legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes. *Id.* Courts must analyze petitions to deny enforcement of arbitration clauses in light of the "liberal federal policy favoring arbitration agreements." *Moses H.*

*Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Great Western,* 110 F.3d at 228 ("There is a strong presumption in favor of arbitration.").

Sagal argues in favor of an exception to the TILA in order to preserve his class action suit against First USA. As both parties recognize, courts have determined that enforcement of arbitration agreements precludes class action suits under the TILA. *See Randolph v. Green Tree Financial Corp.,* 991 F.Supp. 1410, 1420 (M.D.Ala.1997); *Lopez v. Plaza Finance Co.,* 1996 WL 210073, at *3 (N.D.Ill. Apr.25, 1996); *Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y.1972).

Class actions under the TILA were common prior to 1974. *See, e.g., Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412 (S.D.N.Y.1972). Congress recognized that class actions under the Act permitted potentially enormous recoveries. *See* S.Rep. No. 278, 93d Cong., 1st Sess. 14–15 (1973). Congress amended the TILA in 1974 to impose a recovery cap in class actions in the amount of the lesser of $100,000 or 1% of a creditor's net worth. 15 U.S.C. § 1640(a) (1974). The legislative history accompanying the 1974 amendments states that Congress intended to restrict the recoveries possible through class action suits as a means to protect creditors and consumers. *See* S.Rep. No. 278, 93d Cong., 1st Sess. 14–15 (1973) ("[T]his objective [of allowing civil penalties under the TILA] can be achieved without subjecting creditors to enormous penalties for violations which do not involve actual damages and may be of a technical nature. Putting a reasonable limit on a creditor's maximum class action liability would seem to be in the best interests of both creditors and consumers."). In 1976, Congress increased the recovery cap to $500,000, where it now stands. § 15 U.S.C. § 1640(a).

 The amendments and accompanying legislative history indicate that Con-

gress recognized class action suits as a useful way to enforce the TILA. *See* S.Rep. No. 590, 94th Cong., 2d Sess. 8 (1976). The TILA, however, does not provide for a statutory right to bring class actions. *See Lopez,* 1996 WL 210073, at *3. Nor does the TILA rely exclusively on class actions as an enforcement mechanism. Section 1640(a)(2)(A) facilitates litigation of individual claims under the TILA by providing for a recovery of twice the actual damages sustained, with a minimum recovery of $100. 15 U.S.C. § 1640(a)(2)(A). Because Congress has not provided for a statutory right to pursue class actions under the TILA, and because there are alternative means to bring suit thereunder, this court does not find that the TILA amounts to a "congressional command" to preserve class action suits at the expense of the FAA. *See McMahon,* 482 U.S. at 226, 107 S.Ct. 2332.

### 2. *Conflict between the FAA and other statutes*

Courts have generally refused to create exceptions to the FAA In *McMahon,* the Supreme Court found that arbitration clauses were binding over claims brought under the Securities Exchange Act and under the Racketeer Influenced and Corrupt Organizations Act. *McMahon,* 482 U.S. at 238, 242, 107 S.Ct. 2332. The Supreme Court similarly found that the Age Discrimination in Employment Act did not override the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The Third Circuit declined to create an exception from the FAA for claims under the Employee Retirement Income Security Act. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1122 (3d Cir.1993). And lower courts have similarly decided that the TILA does not override the FAA. *See Randolph v. Green Tree Financial Corp.,* 991 F.Supp. 1410 (M.D.Ala.1997); *Lopez v. Plaza Finance Co.,* 1996 WL 210073 (N.D.Ill. Apr.25, 1996); *Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y.1972).

■ This court finds no basis on which to distinguish the present case from these decisions which decline to carve exceptions from the FAA. As such, this court is required to enforce the arbitration agreement. *See United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.").

### B. *Relief*

■ First USA asks the court to dismiss Sagal's suit under Federal Rule 12(b)(1), or in the alternative, to order a stay in favor of mandatory arbitration. The FAA provides that courts shall enter a stay pending arbitration when issues brought before the courts are subject to arbitration clauses. 9 U.S.C. § 3 (1994). Courts have interpreted the provision, however, to permit dismissal if all issues raised in an action are arbitrable and must be submitted to arbitration. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992); *Sparling v. Hoffman Construction Co., Inc.,* 864 F.2d 635, 638 (9th Cir.1988); *Pelegrin v. United States Filter,* 1998 WL 175880, at *4 (D.Del. Mar.31, 1998); *Hoffman v. Fidelity and Deposit Co.,* 734 F.Supp. 192, 195 (D.N.J.1990).

Sagal does not dispute that all aspects of his claims are covered by the terms of the arbitration clause. As such, all issues related to this litigation must be arbitrated, and no issues remain before the court. Accordingly, the court will not retain jurisdiction pending the completion of arbitration.

The court will enter an Order in accordance with this Opinion.