Curtis MARSH, et al., Plaintiffs,

v.

FIRST USA BANK, N.A., Defendant.

No. 3:99–CV–0783–T.

United States District Court,
N.D. Texas,
Dallas Division.

May 23, 2000.

Britton David Monts, Attorney at Law, Steven N. Williams, Attorney at Law, Jason T. Mackey, Attorney at Law, Monts & Ware, Dallas, TX, plaintiffs.

Jeffrey Mark Tillotson, Attorney at Law, Renee Skinner, Attorney at Law, Lynn Stodghill Melsheimer & Tillotson, Dallas, TX, for First USA Bank NA, defendant.

John Mitchell Nevins, Attorney at Law, Moseley & Standerfer, Dallas, TX, for National Arbitration Forum, amicus.

*ORDER GRANTING MOTION TO COMPEL ARBITRATION, DISMISSING PLAINTIFFS' COMPLAINT, GRANTING IN PART DEFENDANT'S MOTION TO STRIKE, AND DENYING PLAINTIFFS' MOTION TO STRIKE*

MALONEY, District Judge.

Before the Court is Defendant First USA Bank's Motion to Dismiss or Stay Proceedings and to Compel Arbitration,

filed on June 11, 1999. Also before the Court is Defendant First USA Bank's Motion to Strike, filed on February 23, 2000, and Plaintiffs' Motion to Strike, filed on March 9, 2000. After consideration, the Court is of the opinion that Defendant's motion to compel arbitration should be granted and, accordingly, Plaintiffs' complaint should be dismissed. Further, the Court believes that Defendant's motion to strike should be granted in part and Plaintiffs' motion to strike should be denied.

### Facts and Procedural History

Defendant First USA Bank provides a revolving line of credit to its customers through the issuance of credit cards. Plaintiffs Curtis Marsh, Darrell Essary, Elizabeth Essary, and Susan Ellis are credit card holders, who bring this lawsuit in their individual capacities and on behalf of a class of similarly situated plaintiffs against Defendant First USA Bank, arising out of Defendant's imposition of late fees and other assessments to Plaintiffs' credit card accounts.[1] Defendant contends that a mandatory arbitration provision contained either in the original Cardmember Agreement or by subsequent amendment thereto, requires the parties to resolve their disputes through arbitration instead of litigation in this Court. Plaintiffs suggest that the arbitration provisions should not be given effect, and that this matter should proceed as a class action. As an ancillary matter, the parties have filed cross-motions to strike evidence submitted by the other in connection with the motion to compel. The primary issue presented for the Court's determination, therefore, is whether the arbitration provision in question compels arbitration.

### Motions to Strike

The Court must first determine whether certain evidence submitted by the parties on the motion to compel arbitration should be considered in ruling on the motion. Defendant filed Objections and Motion to Strike, complaining that exhibits 3 through 8 of Plaintiffs' Opposition, which are newspaper and magazine articles, are inadmissible hearsay and irrelevant to the present matter under consideration. Additionally, Defendant objects to three affidavits submitted by Plaintiffs. Responding to Defendant's objections, Plaintiffs seek to exclude the affidavit of Defendant's employee.

Exhibit 3 of Plaintiffs' Opposition is a transcript of an episode of the ABC News program *Nightline*, concerning a segment on Defendant's practice of delaying posting of payments, which results in the imposition of late fees. Exhibit 4 is a written memorandum, dated February 18, 1998, from Bank One (Defendant's parent corporation) concerning timely posting of card member payments by the National Processing Company (NPC), a company contracted by Defendant to process credit card payments. Exhibit 5 is a report dated March 3, 1998, by a consultant hired by First USA to audit the payment posting process employed by NPC, which concludes that delays between receipt of card member payments and posting of those payments exist in some processing centers. Exhibit 6 comprises two documents: a comparison of credit card fees charged by Defendant and other banks, and a copy of a *Dallas Morning News* article, dated August 17, 1999, titled "Credit Card Users Face Higher Fees." Exhibit 7 is an article from the November 1999, edition of the personal finance magazine *Kiplinger's*, concerning the delayed posting practices of Defendant which result in the imposition of late fees. Exhibit 8 is a sample form letter from Bank One, advising credit card holders that inadvertent late fees assessed to them for the period November 1998, through March 1999, will be credited to their accounts.

■ The Court concludes that Plaintiffs' exhibits 3 through 8 concern the merits of

---

1. Plaintiffs filed this lawsuit as a class action under Fed.R.Civ.P. 23. However, as of this date the Court has not certified this proceeding as a class action.

the underlying dispute between the parties and, therefore, are irrelevant to the question of arbitration. Plaintiffs suggest that exhibits 3 through 8 are merely provided as background information. The only issue presented, however, is whether arbitration should be compelled under the terms of the Cardmember Agreement. As such, background information related to the merits of the dispute will be stricken as immaterial.

■ Defendant also objects to the affidavit of Todd B. Hilsee (exhibit 11). Hilsee's affidavit was executed in connection with another class-action lawsuit against Defendant in an Oregon state court.[2] In that case, Hilsee was offered by the plaintiffs as an expert witness in the field of direct-mail notification. He gave opinions on the method by which Defendant sent notice of the arbitration amendment to card holders in that lawsuit. Defendant complains that Hilsee's affidavit constitutes inadmissible hearsay and it is irrelevant because Delaware law (applied under the terms of a choice-of-law provision in the Cardmember Agreement) prescribes the manner for amendments to credit card agreements.

The Court disagrees with Defendant's assessment of the Hilsee affidavit. To the extent that Hilsee's statements illuminate facts which bear on the issue of whether the notices were more likely or less likely to have been sent by Defendant, such affidavit is relevant. *See* FED.R.EVID. 401. Additionally, while Hilsee's affidavit may meet the technical definition of hearsay, such is true of every non-party witness affidavit submitted in support of a motion because it is offered to prove matters asserted therein. The Court cannot accept such a rigid application of the hearsay rule under these circumstances. *See* FED. R.EVID. 807. That Hilsee's affidavit was offered in another proceeding does not

make it less trustworthy. Thus, the Court will consider Hilsee's affidavit.

■ Defendant's last evidentiary objection is directed to the affidavits of Plaintiffs Susan Ellis and Curtis Marsh. Defendant simply suggests that some of the statements contained in the affidavits of these two Plaintiffs are "self-serving" and conclusory. The self-serving nature of the affidavits is no basis for striking them. Indeed, it would be a curiously ineffectual affidavit of a party that did not in some manner advance that party's cause.

■ Defendant further suggests that the affidavits must comply with the requirements for the admissibility of affidavits for purposes of summary judgment. Specifically, Defendant argues that the conclusions contained in Plaintiffs' affidavits should be stricken. Defendant urges its objections on the basis of the following language in FED.R.CIV.P. 56: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Defendant's reliance on Rule 56(e) is misplaced. While the affiant must set forth *facts* in support of his contention, the witness is not prohibited from further elaborating upon and drawing reasonable conclusions based upon those facts. To the extent that the conclusions of Plaintiff Marsh, who is an attorney, contain ultimate conclusions of law, the Court will simply disregard those portions of the affidavit.

Plaintiffs' motion to strike targets the affidavit of Donna Barrett, an employee of Defendant. In her affidavit, Barrett states that she has personal knowledge of all matters contained therein, including her familiarity with Plaintiffs' credit card accounts and her knowledge of facts concerning Defendant's mailing of the arbitra-

---

2. *Maria L. Navarro–Rice, et al. v. First USA Bank, et al.,* 97–09–06901 (Multnoma Co. Cir. Ct.)

**914**

tion amendment. Plaintiffs contend that Barrett's subsequent deposition contradicts her affidavit. During her deposition, Barrett testified that she did not have specific first hand knowledge that each Plaintiff's billing statement contained the subject arbitration amendment because an independent statement processing company actually placed the notices in the billing statements.

While Barrett's later deposition testimony appears to conflict with her affidavit, the affidavit should not be stricken solely for that reason. Rather, the Court will consider Barrett's affidavit in conjunction with her later testimony and give both due consideration in light of the inconsistencies. Accordingly, Plaintiffs' objections to Barrett's affidavit are overruled and their motion to strike is denied.

### *Motion to Compel Arbitration*

#### *Applicable Law on Arbitration*

A resolution of the present dispute necessarily demands an examination of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*[3] Section 2 of the Act provides:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

■ Through express language, the Supreme Court has left no doubt that the FAA evinces a federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Moses H.*

*Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Courts must "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Thus, the FAA was intended by Congress to "revers[e] centuries of judicial hostility to arbitration agreements." *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

■ The FAA requires that an arbitration agreement, as any other contractual provision, be enforced by the courts according to its terms, if it is otherwise valid under general principles of contract law. *Volt Information Sciences, Inc. v. Board of Trustees,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). However, in furtherance of the purpose of the FAA, when a court undertakes the interpretation of an arbitration provision covered by the FAA, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Mastrobuono v. Shearson Lehman Hutton, Inc., et al.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), *quoting Volt,* 489 U.S. at 476, 109 S.Ct. 1248.

■ On a motion to compel arbitration by an aggrieved party, the Court shall decide the issue of arbitrability summarily. 9 U.S.C. § 4. Further, evidence on the motion may be received by the Court. *Moses H. Cone Mem. Hospital,* 460 U.S. at 22, fn. 26, 103 S.Ct. 927. However, a resolution of the arbitrability question "call[s] for an expeditious and summary hearing, with only restricted inquiry into factual issues." *Id.,* 460 U.S. at 22, 103 S.Ct. 927.

**3.** Plaintiffs do not suggest that the arbitration agreement is not a "contract evidencing a transaction involving commerce" under § 2 of the FAA. Indeed the Cardmember Agreement was entered into by Defendant, a Delaware corporation and Plaintiffs, who are citizens of Texas. Thus, the FAA applies to this dispute.

*Plaintiffs' Objections to the Arbitration Provision*

Plaintiffs attack the arbitration provision on several fronts. First, they allege that Plaintiffs Marsh and Ellis did not receive notice of the arbitration provision and, therefore, they are not bound by its terms. As their second basis of contention, Plaintiffs suggest that the arbitration clause is unconscionable and oppressive and, consequently, it is unenforceable. Third, Plaintiffs argue that enforcement of the arbitration provision will deprive them of their constitutional right to a trial by jury, as well as deny them the benefits of statutory remedies and procedures authorized by the provisions of the Truth in Lending Act (TILA). Finally, Plaintiffs contend that arbitration cannot be compelled because the arbitral forum selected to arbitrate their claims, National Arbitration Forum, is not a neutral arbiter; rather, it is simply a biased collection agency for Defendant.

*Validity of the Arbitration Provision*

Plaintiff Susan Ellis opened her credit card account with Defendant in May 1993, and Plaintiff Curtis Marsh opened his account in August 1997. Their original Cardmember Agreements do not contain the arbitration provision. During the period November 1997, through January 1998, Defendant sought to amend the Cardmember Agreement so as to provide an arbitration provision which required Defendant and its card members to resolve all disputes arising out of the agreement through binding arbitration.

Plaintiffs Darrell Essary and Elizabeth Essary became card members in September 1998, *after* the arbitration provision had been added. Consequently, their original Cardmember Agreements contained the arbitration provision.[4]

The initial paragraph of the original Cardmember Agreement, which applies to all Plaintiffs herein, states: "Any use of your Card or Account confirms your acceptance of the terms and conditions of this Agreement." The Agreement also contains a choice-of-law provision which states that it is governed by the law of Delaware and applicable federal law. Plaintiffs do not contest the applicability of Delaware contract law to the Agreement. With respect to Defendant's lawful ability to amend an existing credit card contract, Delaware law statutorily provides, *inter alia:*

> Unless the agreement governing a revolving credit plan otherwise provides, a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to plan benefits or features ... arbitration or other alternative dispute resolution mechanisms, or other matters of any kind whatsoever.... Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower.

DEL.CODE ANN. tit. 5, § 952(a). Pursuant to the statute, the Plaintiffs' Cardmember Agreements contained an amendment clause which allowed Defendant to amend the terms of the Cardmember Agreement "at any time" upon notice. Thus, each Plaintiff was statutorily and contractually bound by a valid amendment by virtue of the use of the credit card.

---

4. Because the Essarys applied for and obtained their credit cards after the amendment became effective, the arbitration provision was contained in their original Cardmember Agreement. Thus, the Essarys, unlike Plaintiffs Marsh and Ellis, do not contend that they were not given adequate notice of the arbitration provision.

*Notice of Arbitration (Plaintiffs Marsh and Ellis)*

The initial issue with respect to Plaintiffs Marsh and Ellis is whether they were afforded notice of the amendment to their Cardmember Agreements to include arbitration, such that they are contractually bound to arbitrate their disputes. Unlike the Essarys, who applied for and received their credit card after the arbitration amendment became effective, the original Cardmember Agreements of Plaintiffs Marsh and Ellis did not contain an arbitration provision. Instead, Defendant later amended their Cardmember Agreements to include the arbitration provision. However, they contest Defendant's assertion that notice of the amendment was inserted in their monthly billing statement and mailed to them. Thus, Plaintiffs Marsh and Ellis contend that the arbitration provision cannot be applied to them because they did not receive notice of the amendment.

*Defendant's Proof of Notice*

Defendant submitted the affidavit of Donna Barrett, senior vice-president for First USA. She stated that Plaintiffs Marsh and Ellis were sent notice of the amendment by mail in January 1998. The notice was contained in Plaintiffs' January 1998, billing statement and stated:

SUMMARY OF CHANGES.

> B. In addition, a provision providing that any disputes between you and First USA are to be resolved by arbitration is being added to your First USA Cardmember Agreement.

The text of the amendment states in pertinent part:

> ARBITRATION: Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed.... Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16....

> This arbitration agreement applies to all Claims now in existence or that may arise in the future except for: (i) Claims that you or we individually filed in a court before the effective date of the amendment of the Agreement adding this arbitration agreement, (ii) Claims advanced in any judicial class actions that have been finally certified as class actions and where notice of class membership has been given as directed by the court before the effective date of the amendment of the Agreement adding this arbitration agreement ...

> IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

In her later deposition, Barrett testified that Defendant's monthly billing statements are prepared and mailed by a third-party contractor, First Data Resources, Inc. Barrett indicated that arbitration notices were sent by First Data to card members during November 1997, and January 1998. She further testified that Defendant made the decision to place the amendment in the monthly billing state-

ment because it was the most reliable method of giving actual notice. According to Barrett, card members will typically open their statements to examine their monthly bill, while separate mail-outs are likely to be summarily discarded without being read.

While Barrett could not state with absolute certainty that the statements sent to Plaintiffs Marsh and Ellis contained the arbitration amendment notice, she testified that it would be very unusual for them not to have received the notice. Defendant and First Data employed various quality assurance controls to ensure that card members received the notices in their monthly billing statements. For example, Defendant initially assigns an advertising code to each card member account. The code identifies the type of inserts a card member will receive with his monthly statement, depending upon various factors related to the card member's consumer profile. Card members with similar consumer characteristics are grouped together in a computer matrix. The matrix information is reviewed by Defendant's employees for accuracy.

Defendant then transmits the matrix information electronically to First Data, where it is downloaded into computers. Statements are prepared with appropriate inserts for each cardmember based on the matrix formula. First Data employees operate machinery which inserts the documents in the monthly statements. During the insertion process, employees of First Data randomly pull statements at pre-designated intervals and physically inspect the contents of the statement to ensure that the appropriate inserts are being placed in the correct card member statements. Copies of the statements and enclosed inserts that have been randomly extracted are sent back to Defendant for quality assurance verification. First Data employees also verify inventory levels of the particular inserts to ensure that all of the inserts have been sent. The statements are then mailed to the card members in

groups, called cycles. There are approximately sixteen cycles per month. During January 1998, the period during which Defendant contends that Plaintiffs Marsh and Ellis were sent the amendment, First Data mailed between six and seven million arbitration amendment inserts to card members.

Defendant also offers the deposition testimony of Patrick Reiff, vice-president of operations for First Data. Reiff corroborated Barrett's testimony that information is sent by Defendant to First Data, which then inserts the various documents in the monthly cardmember statements according to the matrices provided by Defendant. Reiff further confirmed that the machine operators periodically pull statements and verify that the appropriate inserts are being placed in the billing statements. Supervisors also inspect a sample statement after every 2,000 to 3,000 statements have been processed. The sequence number of a randomly-drawn statement is entered into the computer in order to record the quality assurance check. Like Barrett, Reiff could not state with absolute certainty that an insert was placed in a particular card member's statement, given the millions of statements processed. However, he testified that there is a "high degree of certainty," based on quality assurance controls in place, that the appropriate inserts were inserted into cardmember statements and sent by mail.

Reiff indicated that Defendant's quality assurance representatives are present at the First Data facility during certain cycles of the process to verify that the proper inserts are being placed in the billing statements. Those representatives validate the instructions transmitted to First Data by Defendant and physically inspect randomly-drawn statements. Reiff was not made aware of any mistakes in the preparation and mailing of Defendant's billing statements during the relevant time period.

### Plaintiffs' Proof of Lack of Notice

Notwithstanding the insertion process and quality assurance measures described by Barrett and Reiff, Plaintiffs Marsh and Ellis claim that they did not receive the arbitration amendment notice, although they admit that they received the billing statement for January 1998. In support of their contention, Plaintiffs offer the affidavit of Marsh, who states that he did not see the notice of the arbitration amendment in his January 1998, statement. Plaintiffs also produced Ellis's affidavit in which she states that she examined the contents of her January 1998, billing statement, which included several advertisements in addition to her periodic statement. Likewise, she found no evidence of the arbitration amendment.

### Discussion of Notice

 Plaintiffs suggest that Defendant must establish that the arbitration notice inserts were actually delivered to them. However, the Court does not believe that Defendant should be held to such an exacting burden. Rather, a letter properly addressed, stamped and mailed may be presumed to have been received by the addressee in the due course of mail. *Wells Fargo Bus. Credit v. Ben Kozloff, Inc.,* 695 F.2d 940, 944 (5th Cir.1983); *Myer v. Callahan,* 974 F.Supp. 578, 584, fn. 7 (E.D.Tex.1997); *Mt. Vernon Fire Ins. Co. v. East Side Renaissance Assoc.,* 893 F.Supp. 242, 245 (S.D.N.Y.1995). Thus, Defendant need only prove that it properly mailed the arbitration notice to its card members. It is not necessary that Defendant prove actual receipt of the notice. Proof of mailing may be accomplished by presenting circumstantial evidence, including evidence of customary mailing practices used in the sender's business. *Wells Fargo,* 695 F.2d at 944; *Myer,* 974 F.Supp. at 584.

In the present case the evidence clearly indicates that the amendment notices were designed to be included in the card members' monthly statements. It was never contemplated by Defendant to mail the amendment notices separately, and Plaintiffs do not suggest otherwise. Several million notices were mailed, each in the same envelope containing the monthly billing statements in January 1998. Plaintiffs Marsh and Ellis admit that they received their January 1998 monthly statements. It is clear, then, that Defendant did in fact mail the monthly statements to Plaintiffs. Therefore, the issue of notice is resolved by determining whether the subject amendment notices were properly inserted in the monthly statements.

 The Court concludes from the evidence presented that Defendant has met its burden of proof that the arbitration notice inserts were correctly placed in Plaintiffs' monthly billing statements. Donna Barrett and Patrick Reiff testified at length concerning the routine business practice of placing the inserts in the card members' monthly statements, and the multi-level quality assurance controls utilized to detect errors. The cardmember information sent by Defendant to first Data is verified before and after the statement is processed. After every 2,000 to 3,000 statements have been processed, one or more are selected at random and visually inspected to ensure that the appropriate inserts are contained within. The sequence numbers of the statements randomly drawn are matched with information on the matrices provided by Defendant. This quality control process occurs throughout each cycle. Additionally, Defendant has representatives on site at the First Data facility to verify compliance with quality assurance standards. Reiff testified that there were no malfunctions or errors during the processing and mailing of the notice inserts.

First Data processes and mails millions of credit card statements monthly, not only for Defendant, but for other banks as well. Plaintiffs Marsh and Ellis contend that they received their account statements, but not the amendment notice. With such extensive quality control procedures in

place, coupled with the fact that account statements were mailed to Plaintiffs, it is implausible that the notices were not sent to Plaintiffs. Certainly, with the volume of account statements processed monthly, it would be unreasonable to expect Defendant to prove with certainty that each Plaintiff's statement contained the notice. Such burden of proof is not the law, for it would be virtually impossible in this era of mass-mailing to prove that any singular item of correspondence was in fact mailed. *Brown v. Giffen Industries, Inc.*, 281 So.2d 897 (Fla.1973). Thus, the Court concludes that Defendant has presented reliable and sufficient evidence to establish that the amendment inserts were properly mailed to Plaintiffs Marsh and Ellis.

■ Having determined that Defendant has satisfied its burden of proof of mailing the inserts, a presumption arises that the amendment notices were received by Plaintiffs Marsh and Ellis. Accordingly, it becomes incumbent upon Plaintiffs to negate the presumption of receipt. The Court concludes, however, that the affidavits of Marsh and Ellis, in which they simply deny receipt of the amendment notices, are insufficient to undermine the presumption of receipt. *See Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2nd Cir.1985) (mere denial is insufficient to rebut presumption); *Leon v. Murphy*, 988 F.2d 303, 309 (2nd Cir.1993); *Mount Vernon*, 893 F.Supp. at 246. *See also* 58 Am.Jur.2d *Notice* § 47 (1989) (mere denial of receipt does not rebut presumption). In order to substantiate their claim that they did not receive the notices, Plaintiffs must instead present some proof that the regular office practice was not followed by Defendant or was carelessly executed, such that the presumption of notice becomes unreasonable. *Meckel*, 758 F.2d at 817. Plaintiffs have offered no evidence, except for their respective affidavits, to rebut Defendant's proof of mailing. Thus, Plaintiffs lack any indicia of objective proof that Defendant failed to follow reasonable procedures during the process of inserting the notices. The Court therefore concludes that Plaintiffs Marsh and Ellis were in receipt of legally sufficient notice of the arbitration amendment, such that it may be enforced against them.

■ The amendment notice also contained an "opt-out" provision whereby card members who did not approve of the arbitration provision or other amendments could close their accounts in writing within thirty days of receipt of the amendment notice. Those card members could not incur additional debt, but they would be allowed to pay off their balances under the terms and conditions of their existing Cardmember Agreements. According to the affidavit of Donna Barrett, none of the Plaintiffs elected to opt-out of the amendments to their Cardmember Agreements by notifying Defendant in writing. Additionally, Plaintiffs continued to use their First USA credit cards after receipt of the amendments. Therefore, Plaintiffs Marsh and Ellis are contractually bound by the arbitration provision of their Cardmember Agreements.

■ As previously noted, Plaintiffs Essary present an entirely different situation than Plaintiffs Marsh and Ellis. The Essarys' original Cardmember agreement contained the arbitration clause. It is a cardinal rule of contract law, recognized by the Supreme Court more than a century ago, that a party is bound by a contract to which he signified his assent and he cannot be heard to complain that he did not read its contents. *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875); *Graham v. State Farm Mutual Automobile Ins. Co.*, 565 A.2d 908, 913 (Del.1989). Thus, the Essarys cannot and do not contend that they were not aware of the arbitration provision contained in their Cardmember Agreement. Having concluded that Plaintiffs agreed to the arbitration provision, the Court now considers their remaining bases of objection to arbitration.

### Unconscionability

Plaintiffs next contend that the arbitration clause is unconscionable and, therefore, unenforceable. Under the principles of Delaware contract law, if the Court determines as a matter of law that the contract in question contains an unconscionable provision, it may refuse to enforce the contract, sever the unconscionable portion, or modify the application of any unconscionable clause. DEL.CODE ANN. tit. 6, § 2–302. In order to render void a contractual provision on the basis of unconscionability, a court must find that the party with superior bargaining power used it to take unfair advantage of the other party. *Graham,* 565 A.2d at 912. Thus, for a contract provision to be deemed unconscionable, its terms must be "so one-sided as to be oppressive." *Id.* However, mere disparity between the bargaining power of the parties will not support a finding of unconscionability. *Id.*

In *Graham,* the Delaware Supreme Court considered an arbitration provision contained in an automobile insurance policy. There, a dispute arose over non-payment of a claim. When the insureds filed suit in superior court, the insurer filed a motion for summary judgment to compel arbitration under the policy. The parties stipulated that the plaintiffs were not explicitly advised of the inclusion of the arbitration provision in the policy. Further, the plaintiffs did not receive a copy of the policy, which contained the arbitration provision, until after they had paid their first premium. *Graham,* 565 A.2d at 910. The court concluded, however, that although the policy was presented to the plaintiffs on a "take-it-or-leave-it" basis, the arbitration provision contained in it did not unfairly favor the insurer. *Id.,* 565 A.2d at 912. *Compare Fritz v. Nationwide Mutual Ins. Co.,* 1990 WL 186448 (Del.Ch.1990) (holding that a compulsory arbitration provision in an automobile insurance policy was unconscionable where the insured was required to arbitrate, while the insurer was not). In *Graham,* both parties would be on equal footing throughout the arbitration process.

In the instant case, while the arbitration provision may have been presented in a take-it-or-leave-it manner, the Court cannot say that it is so lopsided in Defendant's favor as to be oppressive or prejudicial. The arbitration provision standing alone does not present an opportunity for one party to gain an unfair advantage over the other in arbitration, any more than the inclusion of a forum selection clause would impede a just result in a court of law. Following *Graham,* the Court concludes that the arbitration provision is not unconscionable.

### Enforceability of the Arbitration Provision

Notwithstanding the validity and applicability of the arbitration provision, Plaintiffs contend that it cannot be enforced against them. First, the provision operates to deprive them of their right to a trial by jury under the Seventh Amendment of the United States Constitution. Next, arbitration would effectively deny them the opportunity to obtain class relief and statutory remedies under TILA. Finally, Plaintiffs complain that the arbitration forum designated to resolve their disputes, National Arbitration Forum, is inherently biased against consumers in general and, therefore, prejudiced against them. Consequently, Plaintiffs cannot be compelled to arbitrate in a forum that denies the exercise of their constitutional and statutory rights, and which cannot be characterized as fair and impartial. The Court will address these arguments sequentially.

### Waiver of Jury Trial Rights

By forcing them to submit their claims to an arbitrator, Plaintiffs insist that they will be deprived of their Seventh Amendment right to a trial by jury. They suggest that the waiver of a constitutional right should be closely scrutinized, and that a waiver of jury trial rights must be

clearly and unmistakably expressed. Plaintiffs believe that Defendant has not demonstrated a waiver of those rights and, therefore, the arbitration provision is unenforceable.

█ Plaintiffs' argument is meritless. Initially, the Court would point out that Plaintiffs agreed to submit to arbitration because they assented to the terms of their Cardmember Agreement. Thus, by agreeing to arbitration they necessarily waived: (1) their right to a judicial forum, and (2) the concomitant right to a jury trial.

Nevertheless, Plaintiffs contend that more is required of them in order to waive their right to present their claims to a jury. Plaintiffs first summon the talisman of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in support of their contention that a waiver of a constitutional right must be voluntarily, knowingly, and intelligently made. However, *Miranda* is completely inapposite to this case because its application is limited to the protection of the rights of criminal defendants after arrest and, therefore, it does not implicate the Seventh Amendment right to a jury trial in a civil case.

In addition, the Court cannot accept Plaintiffs' invitation to apply a "close scrutiny" requirement to the waiver of jury trial rights. The authority cited by Plaintiffs for that proposition is simply not applicable because it arises in the context of judicial proceedings wherein a jury trial was initially requested, but later denied on procedural grounds: *McDonald v. Steward*, 132 F.3d 225 (5th Cir.1998) (holding that a *pro se* prisoner plaintiff did not waive his jury trial rights by consenting to proceed before a federal magistrate); *McAfee v. U.P. Martin*, 63 F.3d 436 (5th Cir.1995) (reversing the trial court and reinstating jury rights after the merits of plaintiff's claims were decided in an extensive pretrial hearing, which amounted to a bench trial); *Bowles v. Bennett*, 629 F.2d 1092 (5th Cir.1980) (concluding that the trial court effectively denied jury right to

plaintiffs by consolidating 42 U.S.C. § 1983 claim for damages with hearing on preliminary injunction, after which all claims were dismissed).

█ Plaintiffs further cite *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), in support of their argument that an arbitration provision that, in effect waives jury trial rights, must be clearly and unmistakably expressed. Contrary to Plaintiffs' assertion, however, *Wright* does not yield such a conclusion. In that case, the Supreme Court stated that in the context of a *collective bargaining agreement*, the courts should carefully examine the agreement to determine whether a union validly waived its members' rights to a judicial forum. However, the *Wright* Court specifically distinguished the question before it from an *individual's* waiver of his own rights—a situation in which the "clear and unmistakable" standard is not applicable. *Id.*, 525 U.S. at 80–81, 119 S.Ct. 391. Thus, outside the area of collective bargaining, in which a third party (the union) seeks to contractually waive the rights of an individual member (the employee), there is no requirement that an arbitration provision must clearly and unmistakably express the waiver of an individual's rights. *Williams v. Imhoff*, 203 F.3d 758 (10th Cir. Feb.14, 2000). Subject to public policy considerations not present here, individuals are free to contractually waive their rights as they see fit.

█ The Seventh Amendment right to a trial by jury is necessarily incident to, and predicated upon the right to a federal judicial forum. Thus, a valid arbitration provision, which waives the right to resolve a dispute through litigation in a judicial forum, implicitly waives the attendant right to a jury trial. Therefore, the Seventh Amendment is not implicated by a contractual provision that precludes access to an Article III forum. *Geldermann Inc. v. Commodity Futures Trading Comm.*, 836 F.2d 310, 323 (7th Cir.1987); *Cremin*

*v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 957 F.Supp. 1460, 1471 (N.D.Ill.1997); *Illyes v. John Nuveen & Co., Inc.*, 949 F.Supp. 580, 584 (N.D.Ill. 1996). *See also Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 716 F.Supp. 268, 270 (S.D.Miss.1989) (holding that the implicit waiver of a jury trial in an arbitration agreement constitutes a waiver of the entire litigation process in the judicial system).

> The Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes.

*Cremin*, 957 F.Supp. at 1471. In the instant case, Plaintiffs agreed to resolve their disputes with Defendant through arbitration. Accordingly, they validly waived their rights to a judicial forum, including the corollary right to a trial by jury.

### TILA Claims

The next component of Plaintiffs' argument against arbitration is that it will deprive them of the procedural and substantive benefits of TILA, namely, the right to proceed as a class and the availability of injunctive relief. Under the terms of the arbitration clause, "any claim, dispute or controversy . . . arising from or relating in any way to this Agreement or your Account . . . shall be resolved by binding arbitration." However, Plaintiffs advance the specious argument that, because the arbitration language does not mention the waiver of TILA statutory rights, such claims cannot be encompassed by the arbitration provision. Again, the "clear and unmistakable" standard is not applicable to a waiver of rights by an individual. Thus, if constitutional rights may be waived without the requirement of exacting specificity, *a fortiori*, statutory rights also may be relinquished in favor of arbitration.

The Court must undertake a two-step inquiry to determine whether Plaintiffs' TILA claims fall within the scope of the instant arbitration provision. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). First, the Court must examine whether the arbitration agreement between the parties encompasses Plaintiffs' TILA claims. Next, the Court should consider whether there are any external legal constraints, i.e., other provisions of federal law, which would preclude arbitration of those claims. *Id.* The express language of the arbitration provision indicates that it applies to "any claim, dispute or controversy" between Plaintiffs and Defendant. It is clear, therefore, that the arbitration provision encompasses Plaintiffs' TILA claims. Accordingly, the Court proceeds to the next inquiry of whether TILA creates a barrier to arbitration.

Citing Congressional intent, Plaintiffs contend that the efficacy of the remedial provisions of TILA will be emasculated if they are not allowed to proceed as a class. Indeed, they suggest that class actions are in fact a preferred method of vindicating rights under TILA. They point to a subsection in the Act that caps the recovery in class actions to the lesser of $500,000 or 1% of a creditor's net worth. 15 U.S.C. § 1640(a)(2)(B). From that provision, Plaintiffs deduce that they have a statutory right under TILA to bring a class action. To that extent, Plaintiffs view a conflict between TILA and the FAA.

Plaintiffs also rely on *Johnson v. Tele–Cash, Inc.*, 82 F.Supp.2d 264 (D.Del.1999), in support of their argument that TILA claims preempt the FAA. There the plaintiff obtained a short-term loan from a bank and executed a loan agreement, which included an arbitration clause. The plaintiff filed a class action complaint against the bank alleging violations under TILA for failure to properly disclose excessively high interest rates (917 percent) and unauthorized account transfers. On the bank's

motion to compel arbitration, the court concluded that Congress intended to make the availability of a class action a necessary part of the remedial purpose of TILA. Arbitration, therefore, would deprive the plaintiffs of their right to pursue class remedies. *Id.,* 82 F.Supp.2d at 271.

The Court finds the rationale of *Johnson* unconvincing. That court admitted that "Congress has not created a statutory right to bring class actions under [the] TILA." *Id.,quoting Lopez v. Plaza Finance Co.,* 1996 WL 210073, at *2–3 (N.D.Ill. Apr.26, 1996). Nevertheless, the *Johnson* court concluded that the remedial purpose of the statute would be "stripped of its sting" if the plaintiffs were required to proceed to arbitration and thus prohibited from obtaining class relief. *Johnson,* 82 F.Supp.2d at 270–71. There, the court reasoned that the damages cap for class actions signified Congress's aim to make class actions an integral part of the statute's deterrent effect on creditors, notwithstanding that no statutory right to class relief was envisioned.

While agreeing with the *Johnson* court that TILA does not create a statutory right to a class action, this Court disagrees with the conclusion that class action remedies are a necessary component of relief. Substantive remedies cannot be created by the availability of a class action. The class action is a procedural vehicle implemented to further the goals of judicial economy and uniform resolution of similar claims by multiple parties. Emanating from Federal Rule of Civil Procedure 23, class actions are just that: procedural. Rules of procedure are established to facilitate the just resolution of substantive rights. As the Supreme Court has explained, courts should be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), *citing* 28 U.S.C. § 2072(b). Accordingly, Plaintiffs are not entitled as a matter of right to proceed as a class.

The Supreme Court has also expressly recognized that statutory claims may be the subject of an arbitration agreement. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). However, arbitration provisions may be unenforceable when Congress directs that another federal law shall override the FAA. *Shearson/American Express,* 482 U.S. at 226, 107 S.Ct. 2332. Procedurally, the party seeking to avoid the provisions of a valid arbitration agreement has the burden of establishing that Congress intended to create an exception to the FAA by "preclud[ing] a waiver of judicial remedies for the statutory rights at issue." *Id.,* 482 U.S. at 227, 107 S.Ct. 2332.

That Congress sought to create a cap on class action damages does not indicate that it favored class remedies. To the contrary, it indicates a concern by Congress that class action damages may result in unjustified awards against the banking industry. As expressed in the Senate Report concerning the cap amendment, the objective was to limit the exposure of banks to excessive class action recoveries:

> This objective [of allowing civil penalties under TILA] can be achieved without subjecting creditors to enormous penalties for violations which do not involve actual damages and may be of a technical nature. Putting a reasonable limit on a creditor's maximum class action liability would seem to be in the best interests of both creditors and consumers.

*Sagal v. First U.S.A. Bank, N.A.,* 69 F.Supp.2d 627, 631 (D.Del.1999), *quoting* S.Rep. No. 93–278, at 14–15 (1973). Thus, rather than creating a statutory right to a class action under TILA, Congress sought to *limit* the extent of class relief. *Sagal,*

69 F.Supp.2d at 632; *Lopez*, 1996 WL 210073 at *3.

In the present case, the Court concludes that TILA does not create an exception to the FAA. Nothing in TILA indicates that Congress intended to create a statutory right to class action relief, or that it preferred the class action as the mechanism by which to effectuate the remedial purpose of the statute. *Gilmer* is particularly instructive in that regard. As the Supreme Court observed in the context of claims under the ADEA, 29 U.S.C. § 621 *et seq.*, "So long as the prospective litigant may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647, *quoting Mitsubishi*, 473 U.S. at 637, 105 S.Ct. 3346.

While Plaintiffs may not be able to utilize the procedural vehicle of a class action in arbitration, they retain all of their substantive statutory rights under TILA. *Thompson v. Illinois Title Loans, Inc.*, 2000 WL 45493, at *4 (N.D.Ill. Jan.11, 2000); *Sagal*, 69 F.Supp.2d at 632. There is no language in the arbitration provision suggesting a limitation of the substantive rights under TILA or any other provision of law. If a particular Plaintiff is successful on the merits of his or her TILA claim, the arbitrator may award actual damages [§ 1640(a)(1) ] plus two times the amount of any finance charges associated with the transaction [§ 1640(a)(2)(A)(i) ], along with attorney's fees and costs [§ 1640(a)(3) ].

■ Furthermore, contrary to Plaintiffs' contention, an arbitrator may order injunctive relief if allowed to do so under the terms of the arbitration agreement. *See Gilmer*, 500 U.S. at 32, 111 S.Ct. 1647; *Sperry Int'l Trade, Inc. v. Government of Israel*, 689 F.2d 301, 306 (2nd Cir.1982). As previously indicated, the arbitration provision covers "any claim, dispute or controversy." Pursuant to Rule 20(D) of the National Arbitration Forum Code of Procedure, "Arbitrators may grant any remedy or relief allowed by applicable sub-

stantive law...." Clearly, then, Plaintiffs may obtain injunctive relief along with statutory damages if they are successful on their claims. Accordingly, Plaintiffs' statutory rights will be adequately preserved in arbitration, even in the absence of a class action.

### Biased Arbitral Forum

By their last volley of arguments, Plaintiffs contend that the arbitration forum to which they are obligated to submit their claims, National Arbitration Forum, cannot provide fair, impartial, and effective extra-judicial relief. Plaintiffs emphatically contend that NAF is prejudiced against them. Specifically, they suggest that NAF and Defendant are engaged in a collusive effort to subvert the arbitration process by arranging biased arbitrators to hear and defeat consumer claims against Defendant. In an attempt to support their conclusions, Plaintiffs point to statistics which purportedly indicate that Defendant has prevailed against its card members in the overwhelming majority of disputes resolved through NAF. From those statistics, Plaintiffs extrapolate that NAF and Defendant are financially "intertwined" such that prejudice can be inferred. Likewise, NAF's perceived reluctance to disclose information on its arbitrators "raises the specter of bias on the part of the arbitrators." Finally, Plaintiffs complain that NAF's arbitration fees are either exorbitant or indeterminate, and that NAF's code of procedure is subject to change at the whim of its director.

Plaintiffs' allegations are unfounded. The Supreme Court considered similar arguments in *Gilmer*, 500 U.S. at 30, 111 S.Ct. 1647. There, the plaintiff contested mandatory arbitration of his ADEA claims. As in the present case, the plaintiff argued that the arbitration forum was biased and inadequate. Weary of such unsubstantiated assertions, the *Gilmer* Court noted:

Such generalized attacks on arbitration "res[t] on suspicion of arbitration as a

method of weakening the protections afforded in the substantive law to would-be complainants," and as such, they are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes."
*Gilmer*, 500 U.S. at 30, 111 S.Ct. 1647, *quoting Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The Supreme Court quickly dispatched the plaintiff's speculative allegations of bias. "We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Gilmer*, 500 U.S. at 30, 111 S.Ct. 1647, *quoting Mitsubishi*, 473 U.S. at 634, 105 S.Ct. 3346.

 Following the reasoning in *Gilmer*, the Court concludes that Plaintiffs' concerns are merely illusory. Plaintiffs' accusations of bias are directed toward NAF, not the independent arbitrators who actually conduct the arbitration. Aside from Plaintiffs' conclusory allegations, there is no evidence whatsoever that they would be unfairly treated by any arbitrator.

In its *amicus* brief, NAF points out that it is a network of more than 400 former members of the judiciary, senior attorneys, and law professors, each with at least fifteen years of professional experience. Indeed, NAF boasts an impressive assembly of qualified arbitrators. In addition to being required to apply applicable law in an arbitration hearing, each member of the arbitration panel must take an oath to follow the NAF Code of Procedure, the Code of Conduct, and prevailing ethical and professional standards. Each arbitrator is obligated to disclose any conflict of interest in the particular dispute, and disqualification will result if bias or interest is found.

The NAF Code of Procedure concisely sets forth the arbitration rules that apply to the arbitrators, the parties, and the claims. To safeguard fairness, it provides that each of the parties may exercise one peremptory strike of a proposed arbitrator and each has unlimited challenges for cause. All legal remedies and injunctive relief are available to the parties. Any party may request a written opinion of the arbitrator's ruling. The filing fee structure is clearly stated and reasonably based on the amount of the claim. The NAF Code authorizes its director to waive the filing fees for indigent individuals in accordance with applicable federal poverty standards. Moreover, the arbitrator may award the cost of the filing fees to the prevailing party.

Plaintiffs suggest that the present arbitration provision is analogous to that in *Randolph v. Green Tree Financial Corp.—Alabama*, 178 F.3d 1149, 1157–59 (11th Cir.1999), *cert. granted*, —— U.S. ——, 120 S.Ct. 1552, 146 L.Ed.2d 458 (2000), where a provision was found unenforceable because it was silent on the issues of filing fees and procedures employed in arbitration proceedings. Thus, the *Randolph* court surmised that the plaintiffs *could* be assessed "steep filing fees" or other high costs of arbitration. *Id.*, 178 F.3d at 1158. However, *Randolph* is clearly distinguishable from the matter *sub judice* because there the arbitration provision did not indicate the arbitral forum to which disputes would be submitted. In this matter, however, the arbitration provision expressly indicates that "Any claim ... shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed." The NAF Code specifically provides for the amount of fees, waiver of fees, recovery of fees after success on the merits, and the procedure employed in arbitration hearings. All of the particular information concerning arbitration proceedings may be found in the NAF Code. It is neither uncommon nor unreasonable for an arbitration provision to incorporate by reference other doc-

uments concerning the specifics of arbitration. *See Gilmer,* 500 U.S. at 23, 111 S.Ct. 1647; *Williams,* 203 F.3d at 762; *Geldermann,* 836 F.2d at 318; *Sagal,* 69 F.Supp.2d at 629.

The Court is satisfied that NAF will provide a reasonable, fair, and impartial forum within which Plaintiffs may seek redress for their grievances. In addition, an arbitration award is subject to review by the Court. 9 U.S.C. § 10. The Supreme Court has declared that "although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the [FAA]." *Shearson/American Express,* 482 U.S. at 232, 107 S.Ct. 2332.

### Dismissal or Stay of Proceedings

Pursuant to § 3 of the FAA, the Court is required to stay proceedings once it determines that the issues raised in the complaint are referable to arbitration. 9 U.S.C. § 3. However, the stay requirement does not preclude dismissal of a case if the Court concludes that all of the claims presented are subject to arbitration. *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992). To maintain jurisdiction under such circumstances would serve no useful purpose. *Id., citing Sea–Land Service, Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 757 (D.Puerto Rico 1986). Because all of their claims fall within the arbitration provision, the Court believes that the claims of Plaintiffs should be dismissed.

### Conclusion

Plaintiffs' claims are subject to compulsory arbitration. They agreed to the arbitration provision by virtue of their Cardmember Agreements. Plaintiffs Marsh and Ellis were sent reasonable notice of the arbitration amendment, to which they did not respond. The original Cardmember Agreement of Plaintiffs Essary contain the arbitration provision. Thus, they cannot complain that they did not receive it.

The arbitration provision is neither unconscionable nor unenforceable, and all of Plaintiffs' statutory rights of recovery will be preserved in arbitration. Moreover, the arbitral forum to which they must present their claims can provide fair and reasonable extra-judicial resolution of their claims. Accordingly, their claims should be dismissed.

It is therefore **ORDERED** that Defendant's Motion to Compel Arbitration, filed on June 11, 1999, is **granted.**

It is **FURTHER ORDERED** that the claims of Plaintiffs Curtis Marsh, Susan Ellis, Darrell Essary, and Elizabeth Essary against Defendant First USA Bank, N.A., are **dismissed without prejudice** to refiling such claims in an arbitration forum, in accordance with their Cardmember Agreements.

It is **FURTHER ORDERED** that Defendant's Motion to Strike, filed on February 23, 2000, is **granted** as to Plaintiffs' exhibits 3, 4, 5, 6, 7, 8.

It is **FURTHER ORDERED** that Defendant's Motion to Strike is **denied** as to Plaintiffs' exhibits 11 (Hilsee affidavit), 15 (Ellis affidavit), and 16 (Marsh affidavit).

It is **FURTHER ORDERED** that Plaintiffs' Motion to Strike, filed on March 9, 2000, is **denied.**

### FINAL JUDGMENT

This action came before the Court, Honorable Robert B. Maloney, presiding, and the issues having been duly considered and a decision having been rendered:

It is **ORDERED** and **ADJUDGED** that the claims of Plaintiffs Curtis Marsh, Susan Ellis, Darrell Essary, and Elizabeth Essary against Defendant First USA Bank, N.A., are **dismissed without prejudice.**

It is **FURTHER ORDERED** and **ADJUDGED** that all relief not specifically granted herein is denied.